**McELROY, DEUTSCH, MULVANEY**
**& CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey and
Dr. Robert Johnson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DR. STEPHEN VATNER,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF TRUSTEES OF THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, and DR. ROBERT JOHNSON,<br><br>Defendants. | Civil Action No.<br><br>**Document Electronically Filed**<br><br>**NOTICE OF REMOVAL** |

TO THE CHIEF JUDGE AND JUDGES OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY:

The Notice of Removal of petitioners University of Medicine and Dentistry of

New Jersey ("UMDNJ") and Dr. Robert Johnson (sometimes collectively referred to as

"defendants"), submitted by their undersigned attorneys, in accordance with the

provisions of 28 U.S.C. §1446, respectfully shows that this action appropriately is

removed from the Superior Court of New Jersey, as follows:

1.      UMDNJ and Dr. Johnson are the only named defendants in a civil action

brought in the Superior Court of New Jersey, Law Division, Essex County, entitled "DR.

STEPHEN VATNER, Plaintiff, v. BOARD OF TRUSTEES OF THE UNIVERSITY OF

MEDICINE AND DENTISTRY OF NEW JERSEY, and DR. ROBERT JOHNSON, Defendants," bearing Docket No. ESX-L-8827-11. This action was commenced on or about November 3, 2011, by and through plaintiff's attorneys, by the filing of a Complaint in Lieu of Prerogative Writs in the Superior Court of New Jersey, Law Division, Essex County.

2.      Defendants were not served with plaintiff's initial Complaint in Lieu of Prerogative Writs.  Rather, plaintiff filed a First Amended Complaint on or about December 9, 2011, which was served on defendants on or about December 15, 2011 (attached hereto as Exhibit A).  Defendants by extension timely filed and served an Answer to the Amended Complaint on February 10, 2012 (attached hereto as Exhibit B).

3.      In Count I of plaintiff's First Amended Complaint, plaintiff alleged that defendants had disciplined plaintiff purportedly in violation of N.J.S.A. 18A:6-18, which provides for certain procedures relating to the discipline of tenured faculty at New Jersey State and County Colleges.  On March 7, 2012, the Court dismissed Count I of plaintiff's Complaint with prejudice for failure to state a claim as the New Jersey statute upon which plaintiff relied does not apply to UMDNJ (a copy of the Court's March 7, 2012 Order is attached hereto as Exhibit C).

4.      By Order dated April 16, 2012, the Court granted plaintiff leave to file a Second Amended Complaint to assert a claim pursuant to 42 U.S.C. § 1983, alleging for the first time in this matter that by imposing certain discipline on plaintiff defendants purportedly violated plaintiff's procedural due process rights under the U.S. Constitution (a copy of the Court's April 16, 2012 Order is attached hereto as Exhibit D).  On or about April 24, 2012, plaintiff filed his Second Amended Complaint (attached hereto as Exhibit

E), which was served on defendants through counsel on May 9, 2012 (a copy of counsel's letter serving plaintiff's Second Amended Complaint is attached hereto as Exhibit F). The foregoing constitutes all process, pleadings and/or orders received by defendants to date within the meaning and intent of 28 U.S.C. § 1446.

3.     This Notice of Removal is being filed within 30 days of service of plaintiff's Second Amended Complaint in compliance with by 28 U.S.C. § 1446(b)(3), thereby allowing defendants to remove this action on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331.

4.     Defendants will file a copy of this Notice of Removal with the Clerk of the Superior Court, Essex County, Essex County Courts Building, 50 West Market Street, Newark, New Jersey, 07102 pursuant to 28 U.S.C. § 1446(d).

5.     Defendants will give written notice to plaintiff via service thereon of a copy of this Notice of Removal, pursuant to 28 U.S.C. § 1446(d).

### Federal Question Jurisdiction Pursuant to 28 U.S.C. § 1331

6.     Plaintiff's Second Amended Complaint alleges that defendants violated plaintiff's federal Constitutional rights.   Specifically, Count One of plaintiff's Second Amended Complaint asserts a claim pursuant to 42 U.S.C. § 1983, based on an alleged deprivation of his rights under the Fourteenth Amendment of the U.S. Constitution. See Second Amended Complaint, First Count, ¶¶ 81, 83–84.

7.     Plaintiff's Second Amended Complaint constitutes a civil action arising under the laws of the United States and, therefore, is an action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because it asserts a private remedy for violating a federal statute, here, 42 U.S.C. §1983, and is removable to this Court pursuant

to 28 U.S.C. § 1441(b). See Smith v. Industrial Valley Title Ins., 957 F.2d 90, 93 (3d Cir. 1992).

8.      Plaintiff's Complaint also raises claims under the laws of the State of New Jersey, namely, N.J.S.A. 34:19-1 et seq. (New Jersey Conscientious Employee Protection Act "(CEPA")) and a common law claim for breach of contract (See Counts Two, Three and Four of plaintiff's Second Amended Complaint).  Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over plaintiff's state law claims in that such claims arise from the same common nucleus of operative facts as plaintiff's claim under the laws of the United States. Therefore, these supplemental claims are removable pursuant to 28 U.S.C. §1441(c).

**WHEREFORE**, Defendants UMDNJ and Dr. Robert Johnson pray that this cause proceed in its entirety in this Court as an action properly removed thereto.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey
and Dr. Robert Johnson

By:_____/s John J. Peirano_____
John J. Peirano

Dated: June 4, 2012

# EXHIBIT A

Knapp, Trimboli & Prusinowski, LLC
210 Park Ave, Suite 302
Florham Park, NJ 07932
973-660-1095
973-660-1096 (fax)
Attorneys for Plaintiff, Dr. Stephen Vatner

| | |
|---|---|
| DR. STEPHEN VATNER,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, and DR. ROBERT JOHNSON<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, ESSEX COUNTY<br><br>**Dkt No.: ESX-L-8827-11**<br><br>**Civil Action**<br><br>**FIRST AMENDED COMPLAINT, COMPLAINT IN LIEU OF PREROGATIVE WRIT, JURY DEMAND, DESIGNATION OF TRIAL COUNSEL** |

Plaintiff Dr. Stephen Vatner, located at 15 West 72nd Street, Apt. #34C, New York, New

York, by way of Complaint says:

**PARTIES**

DEC - 9 2011

1.      Defendant, University of Medicine and Dentistry of New Jersey ("UMDNJ"), is a

University in the State of New Jersey with its principal place of business located at 65 Bergen

Street, Newark, New Jersey, 07101.

2.      Defendant Robert Johnson, M.D., is the Dean of New Jersey Medical School and

an employee of UMDNJ.

3.      Plaintiff, Stephen Vatner, M.D., is currently employed by the Defendant as a

tenured Professor and Director of the Cardiovascular Research Institute ("CVRI").

**FACTS COMMON TO ALL COUNTS**

4.      On or about June 20, 2000, Plaintiff and Defendant, UMDNJ, entered into a

contractual agreement, which stipulated that Plaintiff would be employed as a Professor with

1

tenure in the Department of Medicine.

5.      Plaintiff's contract with UMDNJ called for Plaintiff's department, Cardiovascular Research Institute (CVRI), to receive funding in the amount of $1.5 million per year guaranteed for at least three years.

6.      A subsequent agreement between Plaintiff and UMDNJ dated June 24, 2002 required the annual funding of $1 million to support the CVRI.

7.      On or about December 31, 2002, the Board of Trustees of UMDNJ approved Plaintiff as Chair of the Department of Cell Biology and Molecular Medicine (CBMM) at UMDNJ.

8.      Plaintiff did not receive a raise in his base salary as a result of his appointment to the position of Chair, nor did he receive an administrative stipend or any other additional pay based upon his appointment as chair.

9.      During Plaintiff's tenure, he has successfully raised CBMM from the bottom 10% to the top 5% nationally based upon National Institute of Health funding among peer departments. This rating is directly attributable to Plaintiff's outstanding work as Chair of the Department.

10.     On or about July 31, 2003, Plaintiff and Defendant entered into an agreement to restructure the June 24, 2002 agreement between the parties.

11.     The July 31, 2003 agreement called for funding of $3.38 million for the fiscal years 2004 and 2005.

12.     On or about April 22, 2005, Plaintiff and UMDNJ entered into a new agreement calling for funding of CVRI in the amount of at least $3 million for the fiscal years of 2006, 2007, and 2008.

2

13.   A March 14, 2007 Agreement was executed between the Plaintiff and UMDNJ calling for funding in the amount of $3.053 million per year for CVRI for the fiscal years 2009, 2010, 2011, and 2012.

14.   In 2008, without Dr. Vatner's authorization, the Department of Cell Biology and Molecular Medicince purchased equipment from an employee. The equipment was necessary for the department and was significantly cheaper than if it was procured through other means.

15.   Even though the equipment was not authorized by Dr. Vatner, he was reprimanded for it having been purchased whereas the individuals responsible for procurement were not disciplined.

16.   The transaction at issue saved a significant amount of UMDNJ's NIH funding and New Jersey funds dedicated to the University; however, Dr. Vatner was disciplined for this having occurred.

17.   Dr. Vatner raised his concerns with the procedures for procuring equipment and other necessary items to compliance lawyers and specifically referenced the waste of NIH funding and public funds based upon the procedures utilized by UMDNJ.

18.   Throughout much of 2008, Plaintiff participated in meetings with Defendant Dean Johnson and other chairs in the University during which Dr. Vatner pressed to have higher administration standards, greater rigor in the curriculum and a reduction in unproductive faculty and staff.

19.   Dr. Vatner's suggestions were rebuffed by the University administration.

20.   On or about December 12, 2008, Plaintiff informed the UMDNJ Ethics Liaison Officer about purchasing irregularities with regard to National Institute of Health (NIH) funds.

21.   Raising this issue led to a reprimand of Plaintiff by UMDNJ.

22.     Plaintiff requested authorization to raise his concerns regarding the billing issues as to the use of NIH funds with the Governor's office and Plaintiff's concern that UMDNJ was imposing arbitrary restrictions on Plaintiff's department which resulted in millions of dollars of NIH grant money being wasted.

23.     The UMDNJ Ethics Liaison forcefully discouraged Plaintiff from providing information about the incident to the Governor's office.

24.     On or about January 8, 2009, Plaintiff disclosed to UMDNJ Compliance Officials that New Jersey Medical School ("NJMS") was collecting duplicate funds for the use of space at their animal research facility.

25.     Plaintiff requested a return of the duplicate funds that his department had been paying.  To the best of Plaintiff's knowledge the duplicate payments have continued.

26.     On or about January 12, 2009, New Jersey Medical School CFO, David Roe, sent a memo to Plaintiff informing Plaintiff that his departmental budget would be reduced by 20% beginning in July 2009 contrary to the contractual obligations the Medical School had previously agreed to regarding funding.

27.     Also in 2009, Dr. Vatner raised concerns regarding perceived conflict of interests on the part of Senior Associate Dean for the Graduate School of Biomedical Sciences.  Such conflicts of interest were not corrected or eliminated.

28.     On or about March 11, 2009 Plaintiff and UMDNJ entered into an agreement amending the March 14, 2007 agreement, which decreased UMDNJ's support to the Department for the fiscal year of 2010 by $610,600.

29.     In January 2010, Defendant Dean Johnson and CFO Roe again informed Dr. Vatner that his departmental budget was to be reduced for academic year beginning July 1, 2010.

4

This reduction in funding was contrary to the contractual obligations the Medical School agreed to with Dr. Vatner.

30.     On or about February 2010, Plaintiff submitted a request for business class travel accommodations so Plaintiff could travel abroad to attend to medical research.  The special accommodations were due to a physical condition Plaintiff has.

31.     The Office of Workplace Diversity at UMDNJ questioned Plaintiff in a pointed and intrusive manner about this condition.  As a result of the interrogation, Plaintiff called the University Ombudsman to express his concerns.

32.     After divulging specific information concerning this and other issues Plaintiff was having within UMDNJ, the University Ombudsman, Neil Schorr, informed Plaintiff he held the position of Vice President for Investigations at UMDNJ, not his former position of Obmudsman. The position change should have been disclosed to Dr. Vatner prior to any specific information concerning Dr. Vatner's issues and concerns being provided to him since Schorr's position as Vice President of Investigations was completely antithetical to being an ombudsman.  Opposed to being an advocate for University facility, Schorr was the individual responsible for initiating and conducting UMDNJ investigations.

33.     In March of 2010 Plaintiff was scheduled to, and received permission for travel abroad to address different research projects in which he was involved.  Plaintiff's trip consisted of stops in France, Manila, and Australia.

34.     Shortly before embarking on this trip, Defendant, Dean Robert Johnson, revoked permission for Plaintiff to continue his collaborative work in Manila.

5

35.     As a result, Dr. Vatner repeated requested that he be allowed to use vacation time for his travel to Manila.  Further, Dr. Vatner confirmed in writing that no research would be performed while he was in Manila.

36.     Due to Dean Johnson's revocation of permission, Plaintiff did not pursue the research that was to be done in Manila.

37.     While Dr. Vatner was away, the Defendants initiated an investigation into Dr. Vatner and interviewed approximately twelve of Dr. Vatner's staff members concerning, *inter alia*, Dr. Vatner's research, travel, finances, purchasing practices, external business relationships, graduate education, and other issues. ("Manila Investigation")

38.     It is believed that this investigation was initiated in whole or in part based upon information Dr. Vatner provided to Neil Schorr prior to Dr. Vatner leaving to attend to his research in France and Australia and vacationing near Manila.  Such information should not have been used against Dr. Vatner since he provided the information under the pretext that Schorr held the position of Ombudsman, not Vice President of Investigations.

39.     It is also believed that the investigation was initiated in whole or in part as a result of Dr. Vatner serving on the dean search committee and opposing Dr. Johnson for the permanent position.

40.     The investigation was further initiated based upon the concerns Dr. Vatner had raised concerning the misuse of NIH and New Jersey public funds.

41.     Upon Plaintiff's return from this trip, Plaintiff was unilaterally suspended without pay for ten working days, allegedly for violating the directive to refrain from pursuing, or in any way being involved in the Manila research.

6

42.    Prior to the discipline being imposed, Plaintiff was not given written charges of the allegations against him, did not have the opportunity to refute the allegations that formed the basis of this ten day suspension, nor did Plaintiff receive a hearing of any kind concerning implementation of this discipline, even though he contested the basis of the discipline.

43.    A report was provided to Dr. Vatner regarding the Manila Investigation with its conclusions in or about October 2010; however, Dr. Vatner only had seven days to respond to its findings and conclusions.

44.    Dr. Vatner provided a twenty page response to the report showing that the research in Manila which was criticized had been authorized by the University.

45.    On or about March 26, 2010, the Subcommittee of Campus Committee on Research Integrity, which was chaired by Dr. Anthony Forrester, opened an investigation regarding Dr. Vatner and preliminary data his team had acquired in several canine research procedures.

46.    This investigation resulted in several members of Dr. Vatner's staff being interviewed on multiple occasions.

47.    It was quickly concluded that there was no basis for the allegations; however, no final report on this was issued for another year.

48.    The UMDNJ by-laws require that the University correct the adverse effects of unwarranted allegations. Dr. Vatner has requested that the University correct the information which was disseminated during the investigation so that his reputation would be restored. This has not happened.

49.    On or about April 12, 2010, another investigation was initiated, this time by IACUC, regarding a canine surgery conducted in March. ("Canine Surgery Investigation")

7

50.  Several staff members were interviewed concerning this incident.

51.  UMDNJ issued a report to the United States Department of Agriculture which was inaccurate and did not provide all of the necessary information.  Specifically, documents Dr. Vatner provided the investigators showing that it was Comparative Medicine Research's (CMR) responsibility to monitor the canine's blood work, which CMR did not perform properly.

52.  Additionally, due to UMDNJ previously not paying for services from the medical laboratory which was to perform the blood tests, the tests for the canines in question were not done.  This led to the canine's demise.  Had the blood chemistries been done, pursuant to customary procedures in patients postoperatively, the problem would have been diagnosed and corrected.

53.  As a result of this inaccurate report, Dr. Vatner's privileges regarding canine research were revoked in May 2010.

54.  Dr. Vatner submitted a letter in response to the IACUC report highlighting the inaccuracies of the report; however, the errors were not corrected.

55.  During most of 2010, routine transactions for Dr. Vatner's department were consistently delayed or blocked by the administration.  Such refusal to approve routine transactions precluded Dr. Vatner and his department from performing effectively and efficiently.

56.  In July 2010, Dr. Vatner was informed by a staff member that due to all of the investigations and funding issues, she was concerned about the viability of the department; therefore, she was negotiating with another medical school future employment.  Several other staff members resigned thereafter for similar reasons, which severely curtailed the ability of the department to operate appropriately and effectively.

8

57.     During much of this time period, Plaintiff served on a committee to screen candidates for the position of Dean of New Jersey Medical School.

58.     Defendant, Interim Dean Robert Johnson, M.D., was a candidate for this position.

59.     During the interview process of the second dean search, Dr. Vatner inquired with interim Dean Johnson as to the Manila Investigation, and Interim Dean Johnson responded by saying that Dr. Vatner should not be concerned with it as everything was allegedly going to be "okay." Interim Dean Johnson further stated that a meeting regarding it would be held. This meeting never took place.

60.     Plaintiff opposed Dr. Robert Johnson's appointment due to his lack of academic credentials. The vast majority of the committee members agreed with Dr. Vatner's assessment regarding Dean Johnson and felt Dean Johnson should not be appointed. As a result, Dean Johnson disbanded the search committee and established a new committee of members he picked in the fall of 2010.

61.     Dr. Johnson was eventually appointed and has pursued a course of retaliation against Plaintiff ever since.

62.     Shortly after his permanent appointment as Dean, Defendant Johnson removed Dr. Vatner as Chair of CBMM.

63.     Dr. Junichi Sadoshima was appointed as interim chair to replace Dr. Vatner.

64.     Subsequently and in addition to the ten day suspension, on or about March 29, 2011, Plaintiff was issued a formal letter of reprimand by Dean Johnson for the alleged improper research taking place in the Philippines.

65.     Prior to the reprimand being issued, Plaintiff was not given written charges of the allegations against him, did not receive an opportunity to refute any of the allegations contained

9

in the formal letter of reprimand, nor was Plaintiff afforded a hearing to confront any of the witnesses who provided the alleged factual basis for this reprimand.

66.     On or about June 8, 2011, Plaintiff received a letter from Dean Robert L. Johnson stating that as a result of Plaintiff's removal as Chair of the Department of Cell Biology and Molecular Medicine, Plaintiff's salary would be reduced retroactive to March 30, 2011. (Attached as Exhibit 1).

67.     Plaintiff's salary was unilaterally reduced by fifty-five thousand dollars ($55,000). This decrease in salary caused Plaintiff's academic base salary to be reduced.

68.     Plaintiff was not provided an opportunity to contest this decrease in salary through a hearing or any other forum in violation of N.J.S.A. 18A:6-18.

69.     On or about June 8, 2011, the new chair of CBMM, Dr. Junichi Sadoshima, prevented Plaintiff from accessing and utilizing the funds guaranteed to CVRI, through the various contracts Plaintiff executed with UMDNJ, even though Plaintiff continues to oversee CVRI.

70.     It was improper for Defendants to deny Dr. Vatner access to funds for CVRI due to his removal as chair. Dr. Vatner's duties, including utilization of funds, for CVRI continue regardless of his position as department chair.

71.     On or about September 7, 2011, Plaintiff, after having made several requests directly to UMDNJ, contacted NIH regarding individuals who were being paid with NIH grant money but were not performing work with, for or on behalf of NIH grant projects.

72.     On or about September 9, 2011, Dr. Sadoshima informed Plaintiff that the request to remove the individuals from NIH grants had again been denied.

10

73.    A supervisor, Dr. Gause has issued an inaccurate performance review which addressed many issues that have been raised by Dr. Vatner on several occasions; however, Dr. Gause has failed and refused to change or correct the inaccurate information.

74.    This review becomes part of Dr. Vatner's permanent personnel file.

75.    Having negative reviews in his personnel file cause ongoing damage to his reputation and ability to perform at UMDNJ or any other institution.

76.    Requiring that the individuals be paid through NIH grant funding when such individuals were not eligible is a violation of UMDNJ policy and United States law.

77.    On or about July 15, 2011, Plaintiff caused to be sent to the Chair of the Board of Trustees of UMDNJ and the Chair of the New Jersey Commission for Higher Education ("NJCHE") a request that the disciplinary matters be referred to the Office of Administrative Law ("OAL") for a formal hearing. (Attached as Exhibit 2).

78.    On or about September 20, 2011, the Board of Trustees of UMDNJ held a Board of Trustees meeting. Pursuant to the public notice for this September 20, 2011 Board Meeting, it is believed and understood that the issues raised by Plaintiff were to be addressed.

79.    The Board of Trustees of UMDNJ failed to take any action regarding Plaintiff's request for his disciplinary issues to be submitted to the OAL for a hearing.

80.    On or about October 6, 2011, Plaintiff caused to be sent to the NJCHE a request that Plaintiff be provided with a hearing before the OAL pursuant to Plaintiff's statutory rights under N.J.S.A. 18A:6-18.

81.    As of the date of the filing of this Complaint, the NJCHE has not advised Plaintiff of any action it intends to take.

11

82.     Pursuant to R. 4:69-1 Plaintiff has complied with the applicable limitations in this matter by filing an Original Complaint in Lieu of Prerogative Writs on November 3, 2011. (Attached hereto as Exhibit 3).

## COUNT ONE
### (Complaint in Lieu of Prerogative Writs)

83.     Plaintiff repeats and incorporates the above claims as if set forth herein.

84.     Pursuant to R. 4:69-1 Plaintiff files this Complaint in Lieu of Prerogative Writs seeking redress trough the appropriate administrative process.

85.     As a tenured professor of a New Jersey University, Plaintiff cannot be disciplined without appropriate procedural due process being provided.

86.     The required due process includes being served with written charges, being presented with the evidence against him, confronting witnesses and being allowed to present defenses to the claims.

87.     Pursuant to N.J.S.A. 18A:6-18 when a disciplinary matter is contested, it shall be referred to the OAL for a hearing to determine findings of fact and initial conclusions of law.

88.     Plaintiff has contested the disciplinary action taken against him and requested that these issues be submitted to the OAL as a contested case.

89.     UMDNJ has failed to submit this matter to the OAL as required by statute.

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of an order compelling UMDNJ to refer Dr. Vatner's disciplinary issues to the Office of Administrative Law for appropriate hearings, compensatory damages, and cost of suit.

12

## COUNT TWO
### (Breach of Contract)

90.     Plaintiff repeats and incorporates the above claims as if set forth herein.

91.     The parties entered into a series of valid enforceable contracts which provided, *inter alia*, a minimum level of funding for CVRI through the fiscal year of 2012.

92.     Defendant has breached its contractual obligations to Plaintiff by reducing the funding for CVRI and preventing Plaintiff from accessing and allocating CVRI funds.

93.     On or about, August 5, 2011, Plaintiff, through counsel, submitted a demand, in the form of a contract claim notice, to Defendant requiring that it cease its illegal actions.

94.     The time for Defendant to remedy its contractual violation pursuant to N.J.S.A. 59:13-1 et seq. and N.J.S.A. 18A:64G-3.10, expired on November 8, 2011.

95.     Defendant remains in violation of its contractual obligations to Plaintiff.

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

## COUNT THREE
### (New Jersey Conscientious Employee Protection Act as to UMDNJ)

96.     Plaintiff repeats and incorporates the above claims as if set forth herein.

97.     Plaintiff reported multiple instances of alleged misuse of NIH funds by UMDNJ to Dean Robert Johnson, possible double billing for use of space and concerns of conflicts of interests within the University.

98.     Plaintiff reasonably believes that the continued misuse of NIH funds by UMDNJ, billing issues, and failure to correct conflicts of interest were illegal and violate of law.

99.     As a result of reporting the illegal use of NIH funds, UMDNJ has engaged in a pattern of retaliatory action against Plaintiff including, *inter alia*, initiating investigations into his actions, failing to correct inaccurate information regarding Dr. Vatner in official reports, issuing unjust discipline against Plaintiff, refusing to provide Plaintiff a hearing as required by New Jersey statute, removal of Plaintiff his position as chair of the department, reducing Plaintiff's academic salary in violation of New Jersey statute, and the withholding of funds to be used by CVRI under Plaintiff's supervision.

100.    Such retaliatory actions are in violation of N.J.S.A. 34:19-1, et. seq., the New Jersey Conscientious Employee Protection Act ("CEPA").

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

### COUNT FOUR
#### (New Jersey Conscientious Employee Protection Act as to Robert Johnson)

101.    Plaintiff repeats and incorporates the above claims as if set forth herein.

102.    Plaintiff reported multiple instances of alleged misuse of NIH funds by UMDNJ to Dean Robert Johnson, possible double billing for use of space and concerns of conflicts of interests within the University.

103.    Plaintiff reasonably believes that the continued misuse of NIH funds by UMDNJ, billing issues, and failure to correct conflicts of interest were illegal and violate of law.

104.    As a result of reporting the illegal use of NIH funds, Dean Johnson has engaged in a pattern of retaliatory action against Plaintiff including, *inter alia*, initiating and refusing to conclude investigations into his actions, issuing unjust discipline against Plaintiff, refusing to

14

provide Plaintiff a hearing as required by New Jersey statute, removal of Plaintiff his position as chair of the department, reducing Plaintiff's academic salary in violation of New Jersey statute, and the withholding of funds to be used by CVRI under Plaintiff's supervision.

105.   Such retaliatory actions are in violation of N.J.S.A. 34:19-1, et. seq., the New Jersey Conscientious Employee Protection Act ("CEPA").

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, Dr. Robert Johnson, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury on all counts.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to the provisions of Rule 4:25-4, the Court is hereby advised that James T. Prusinowski, Esq., is designated as trial counsel.

## CERTIFICATION OF ATTORNEY

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action. R. 4:5-1.

KNAPP, TRIMBOLI & PRUSINOWSKI, LLC
Attorneys for Plaintiff,
Dr. Stephen Vatner,

James Prusinowski, Esq.

Dated: December 8, 2011

15



**UMDNJ**

**NEW JERSEY MEDICAL SCHOOL**

University of Medicine & Dentistry of New Jersey

Office of the Dean

June 8, 2011

Stephen Vatner, MD
15 West 72nd Street, Apt. #34C
New York, New York 10023

Dear Dr. Vatner:

This is a confirmation of our discussion on March 29, 2011 that effective March 30, 2011, you no longer serve as Chair, Department of Cell Biology and Molecular Medicine.

Effective March 30, 2011, your new academic base salary component as a full Professor and Director of Cardiovascular Research Institute will be $190,000; your Faculty Practice Salary Component will remain at $214,500. This Faculty Practice Salary Component will remain in effect for as long as you generate $135,000 in salary support from grant funding. To the extent that you have been overpaid since that date, we will be in touch with you concerning repayment.

As Director of CVRI, you will report to the Executive Director and the Senior Associate Dean for Research. As Director, you will be responsible to obtain extramural funding, coordinate integrative research among multiple investigators at multiple sites, publish papers, give presentations, and conduct graduate and postdoctoral training on the causes of heart disease and heart failure, the mechanisms of potential therapeutic agents, and novel therapeutic approaches.

As Director of CVRI, you serve in an administrative capacity at the will of the Dean. Should it happen that you no longer hold an administrative position at NJMS, your academic base salary will be adjusted and, any clinical salary supplement also will be adjusted to reflect your changed responsibilities. You remain outside the unit of employees represented by the American Association of University Professors (AAUP) because you will hold a faculty administrator position and the title and responsibilities of Director.

The duties and responsibilities of your position as full Professor and Director of CVRI will include, but are not limited to:

- Strengthen the Cardiovascular Research Institute's research and training programs;

- Establish goals and objectives for the research team, supervises laboratory operations, creates research policies and oversees quality control of research data under the direction of the Executive Director;

- Oversee the preparation of grant applications, progress reports, IACUC protocols, manuscripts, presentations and other scholarly output from the CVRI;

- Cultivate the independent creativity of faculty and trainees, and catalyzes inter-disciplinary collaborative grant applications with other members of the research

185 South Orange Avenue, Newark, NJ 07103-2714 ▪ Phone: (973) 972-4538 ▪ Fax: (973) 972-7104 ▪ Web Site: www.umdnj.edu/njmsweb/
The University is an affirmative action/equal opportunity employer

community;

- Develop innovative translational research programs in collaboration with clinical cardiologists, and oversees the related physician-scientist training program;

- Leverage the CVRI as a research platform for fostering multi-disciplinary interactions and collaborations that will transform patient care in the coming decade;

- In conjunction with the Executive Director, oversee planning of future projects to assure an ongoing grant portfolio. Identify new areas of potential research collaboration, design experiments and obtain preliminary data;

- Develop and oversee all CVRI core facilities including Biochemistry, Histology, Echocardiography, Rodent Surgery, Physiology, Research Engineering and Administration (finance and administrative support staff);

- Understand and adhere to UMDNJ's compliance standards as they appear in UMDNJ's Corporate Compliance Policy, Code of Conduct and Conflict of Interest Policy;

- Keep abreast of all federal, state and UMDNJ regulations, laws and policies as they presently exist and as they change or are modified;

- Perform other duties as assigned by the Chair.

Your annual performance evaluation will be completed by the Chair of the Department of Cell Biology and Molecular Medicine.

Please sign below indicating your acceptance of the terms of this letter.

We wish you continued success at UMDNJ-New Jersey Medical School.

Sincerely,

Robert L. Johnson, MD, FAAP
The Sharon and Joseph L. Muscarelle Endowed Dean

Accepted by:

_____

Stephen Vatner, MD

C:   Maria Soto-Greene, MD, FACP, Vice Dean
     William Gause, PhD, Senior Associate Dean for Research
     Junichi Sadoshima, MD, PhD, Interim Chair, Department of Cell Biology & Molecular Medicine.



KNAPP, TRIMBOLI & PRUSINOWSKI, LLC.

*Please Respond to our New Jersey Office*

July 15, 2011

**Via UPS Overnight Mail**
Kevin M. Barry, M.D., M.B.A., Chair
Board of Trustees
University of Medicine and Dentistry of New Jersey
65 Bergen Street
Room 1535
University Heights
Newark, New Jersey 07101-1709

Re:     **Dr. Stephen Vatner – Disciplinary Action**

Dear Dr. Barry:

This office represents Dr. Stephen Vatner, a tenured professor with the University of Medicine and Dentistry of New Jersey. Several disciplinary actions have been taken against him recently which are in violation of his due process rights under applicable statute, and Dr. Vatner hereby demands that the discipline be vacated for failure to have followed the required procedures for these disciplinary actions. This includes a ten-day suspension with loss of salary that was imposed on March 29, 2010, a letter of reprimand issued on March 29, 2011, and a salary decrease effective June 8, 2011, which was retroactive to March 30, 2011.

Dr. Vatner is a tenured professor with UMDNJ and Director of the Cardiovascular Research Center (CVRI). Until recently, he also served as Chair of the Department of Cell Biology and Molecular Medicine. In these positions, he is required to engage in teaching duties as well as research.

In March 2010 Dr. Vatner was scheduled to travel abroad to address several research projects in which he was involved. This travel involved a stop in France to put together a prestigious LeDucq proposal, which requires French investigators and another was to continue collaborations with Dr Robert Graham in Australia, where Dr Graham's sabbatical to UMDNJ was arranged. An intermediate stop was scheduled for Manila, where the original intent was to do a collaborative research project. Initially, approval was granted by Dean Johnson for the entire trip and accordingly non-refundable tickets were booked. Shortly before leaving, Dean Johnson revoked permission for Dr Vatner to do the collaborative work in Manila. Accordingly, Dr Vatner agreed not to go to Manila for the research project. Instead, he used that portion of the trip to take vacation and visit a resort several hundred miles from Manila. Dr Vatner agreed to pay for the entire trip personally, including the other segments involving UMDNJ grant applications. Dean Johnson acknowledged this request and told Dr Vatner that he would get back to him and let him know if this was acceptable. At this point in time, Dr. Vatner had already booked all of his flights to go to the various locations, and the Philippines was the second of the

210 Park Ave Suite 302        Florham Park, NJ 07932        Tel: 973 660-1095
1133 Broadway Suite 708        New York, NY 10010        Tel: 212 334-9750        www.ktplawyers.com

numerous stops. He could not change his travel plans, without significant cost in cancellation fees and due to the scheduling of events involving Professors at multiple institutions in Europe and Australia before and after the Manila trip. As such, Dr. Vatner used his personal vacation time and used his personal resources for the entire trip and did not charge the University any of the travel costs for any part of the trip and he did not attend to any of the research that was going on in Manila. Upon returning to New Jersey, he was unilaterally suspended for ten workdays without pay for having traveled to the Philippines. (Exhibit 1). Dr. Vatner did not have an opportunity to refute the allegations of this discipline and despite his repeated requests, Dr. Vatner did not receive a hearing of any kind concerning this discipline.

On March 29, 2011, Dr. Vatner was issued a letter of reprimand by Dean Johnson concerning the alleged improper research taking place in the Philippines. (Exhibit 2). Again, Dr. Vatner was not provided an opportunity to refute any of the allegations in the three page letter of reprimand nor was he provided an opportunity to have a hearing or confront any of the factual witnesses supposedly providing information concerning this research.

On or about March 30, Dr. Vatner was removed as Chair, Department of Cell Biology and Molecular Medicine. On June 8, 2011 Dr. Vatner received a letter from Dean Johnson providing that his salary would be reduced retroactive to March 30 in the amount of $55,000.00. (Exhibit 3). The letter implies that the reduction in salary was a result of his being removed as Chair. As set forth in the rebuttal letter submitted June 14, 2011, Dr. Vatner did not receive a salary increase for taking the position as Chair; therefore, the salary reduction was improper. (Exhibit 4). Once the salary reduction was implemented (Exhibit 5), Dr. Vatner's academic base was reduced in violation of his tenure rights and statutory law. As with the prior disciplines, Dr. Vatner was not provided an opportunity to contest the factual basis for the Dean's actions and has not been provided an opportunity to confront any of his accusers or have a meaningful hearing on the issues.

A professor at a state college or university who has tenure shall not be dismissed or subject to reduction of salary except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause. Written charges of the cause or causes preferred against an individual shall be signed by the person or persons making the same and file with the Board of Trustees of said college or school. N.J.S.A. 18A:6-18. Upon determination that the matter is a contested case, the Board shall assign the matter for hearing and an initial decision by the Office of Administrative Law. Id.

Dr. Vatner was not served with any charges in any of the above matters. Rather, the Dean unilaterally imposed disciplinary action against him in these three scenarios despite Dr. Vatner's tenure rights. Furthermore, Dr. Vatner adamantly contests the factual allegations of each of the three issues and when there are factual disputes of disciplinary action, the matter must be submitted to the Office of Administrative Law for a hearing, findings of fact and initial conclusions of law. This has not been done. As such, the University is in violation of its obligations under applicable statute to ensure that written charges are preferred against a tenured professor prior to the disciplinary action being taken. Further, the University is under an

Kevin M. Barry, M.D., M.B.A., Chair
July 15, 2011
Page 3 of 3

affirmative obligation to submit the disciplinary action to the Office of Administrative Law for determinations on the allegations.

Since the University has failed to perform its duties and obligations under the applicable statute, and since Dr. Vatner has been prejudiced by the University's failure to perform its obligations, these three disciplinary actions must be rescinded and vacated. Dr. Vatner should have ten days of pay restored to him, refunded the money he expended for the research trip, and the ten-day suspension should be removed from his file. Further, the written reprimand should be removed from his file and permanently destroyed. Finally, Dr. Vatner's original salary must be reinstated retroactive to March 30, 2011.

Should the University fail to remedy these actions, Dr. Vatner requires that this matter be submitted to the Office of Administrative Law for hearings on these issues and initial determinations rendered. We are submitting a copy of this letter to the New Jersey Commission of Higher Education and requesting that it also refer this matter to the Office of Administrative Law for proper proceedings.

Your prompt attention to this matter is appreciated.

Respectfully submitted,
Knapp, Trimboli & Prusinowski, LLC

James T. Prusinowski, Esq.

Attachments
cc:     Bradford Hildebrandt, Secretary – Via UPS Overnight
        Edward J. Graham, Chair, NJCHE    - Via UPS Overnight
JTP:crj



**Appendix XII-B1**

| CIVIL CASE INFORMATION STATEMENT (CIS) | |
|---|---|
| **CIVIL CASE INFORMATION STATEMENT (CIS)**<br><br>Use for Initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed | PAYMENT TYPE: ☐CK ☐CG ☐CA<br>CHECK NO.<br>AMOUNT:<br>OVERPAYMENT:<br>BATCH NUMBER: |

| ATTORNEY - PRO SE NAME<br>James T. Prusinowski, Esq. | TELEPHONE NUMBER<br>(973) 660-1095 | COUNTY OF VENUE<br>Essex |
|---|---|---|
| FIRM NAME (if applicable)<br>Knapp, Trimboli & Prusinowski, LLC | | DOCKET NUMBER (when available)<br>ESX-L-8327-11 |
| OFFICE ADDRESS<br>210 Park Avenue<br>Suite 302<br>Florham Park, NJ 07932 | | DOCUMENT TYPE<br><br>JURY DEMAND ☒ YES ☐ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>Dr. Stephen Vatner | CAPTION<br>Vatner v. Board of Trustees of the University of Medicine and Dentistry of New Jersey |
|---|---|
| CASE TYPE NUMBER (See reverse side for listing)<br>701 | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☒ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| RELATED CASES PENDING?<br>☐ YES ☒ NO | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☒ YES ☐ NO | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)<br>☐ NONE<br>☒ UNKNOWN |

| THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE. |
|---|

| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION | |
|---|---|
| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?<br>☒ YES ☐ NO | IF YES, IS THAT RELATIONSHIP:<br>☒ EMPLOYER/EMPLOYEE ☐ FRIEND/NEIGHBOR ☐ OTHER (explain)<br>☐ FAMILIAL ☐ BUSINESS |
| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☐ YES ☒ NO | |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

NOV - 3 2011

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ YES ☐ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED?<br>☐ YES ☒ NO | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY'S SIGNATURE



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule 4.5-1*

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
- 151   NAME CHANGE
- 175   FORFEITURE
- 302   TENANCY
- 399   REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
- 502   BOOK ACCOUNT (debt collection matters only)
- 505   OTHER INSURANCE CLAIM (including declaratory judgment actions)
- 506   PIP COVERAGE
- 510   UM or UIM CLAIM (coverage issues only)
- 511   ACTION ON NEGOTIABLE INSTRUMENT
- 512   LEMON LAW
- 801   SUMMARY ACTION
- 802   OPEN PUBLIC RECORDS ACT (summary action)
- 999   OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
- 305   CONSTRUCTION
- 509   EMPLOYMENT (other than CEPA or LAD)
- 599   CONTRACT/COMMERCIAL TRANSACTION
- 603N  AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
- 603Y  AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
- 605   PERSONAL INJURY
- 610   AUTO NEGLIGENCE – PROPERTY DAMAGE
- 621   UM or UIM CLAIM (includes bodily injury)
- 699   TORT – OTHER

**Track III - 450 days' discovery**
- 005   CIVIL RIGHTS
- 301   CONDEMNATION
- 602   ASSAULT AND BATTERY
- 604   MEDICAL MALPRACTICE
- 606   PRODUCT LIABILITY
- 607   PROFESSIONAL MALPRACTICE
- 608   TOXIC TORT
- 609   DEFAMATION
- 616   WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
- 617   INVERSE CONDEMNATION
- 618   LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
- 156   ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
- 303   MT. LAUREL
- 508   COMPLEX COMMERCIAL
- 513   COMPLEX CONSTRUCTION
- 514   INSURANCE FRAUD
- 620   FALSE CLAIMS ACT
- 701   ACTIONS IN LIEU OF PREROGATIVE WRITS

**Centrally Managed Litigation (Track IV)**
- 280   ZELNORM
- 285   STRYKER TRIDENT HIP IMPLANTS
- 288   PRUDENTIAL TORT LITIGATION
- 289   REGLAN

- 290   POMPTON LAKES ENVIRONMENTAL LITIGATION
- 291   PELVIC MESH/GYNECARE
- 292   PELVIC MESH/BARD
- 293   DEPUY ASR HIP IMPLANT LITIGATION

**Mass Tort (Track IV)**
- 248   CIBA GEIGY
- 266   HORMONE REPLACEMENT THERAPY (HRT)
- 271   ACCUTANE/ISOTRETINOIN
- 274   RISPERDAL/SEROQUEL/ZYPREXA
- 278   ZOMETA/AREDIA
- 279   GADOLINIUM

- 281   BRISTOL-MYERS SQUIBB ENVIRONMENTAL
- 282   FOSAMAX
- 284   NUVARING
- 286   LEVAQUIN
- 287   YAZ/YASMIN/OCELLA
- 601   ASBESTOS

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

Please check off each applicable category   ☐ Putative Class Action   ☐ Title 59

Effective 08/20/2011, CN 10517-English

**EXHIBIT** B

**McELROY, DEUTSCH, MULVANEY**
**& CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey and
Dr. Robert Johnson

| | |
|---|---|
| DR. STEPHEN VATNER,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF TRUSTEES OF THE<br>UNIVERSITY OF MEDICINE AND<br>DENTISTRY OF NEW JERSEY, and<br>DR. ROBERT JOHNSON,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>ESSEX COUNTY<br><br><br>DOCKET NO.: ESX-L-8827-11<br><br><br>CIVIL ACTION<br><br>**ANSWER TO FIRST AMENDED<br>COMPLAINT, COMPLAINT IN<br>LIEU OF PREROGATIVE WRIT<br>AND JURY DEMAND** |

Defendants University of Medicine and Dentistry of New Jersey ("UMDNJ") and Dr. Robert Johnson (hereinafter sometimes collectively referred to as "defendants"), through their attorneys, hereby respond to the First Amended Complaint, Complaint In Lieu of Prerogative Writ and Jury Demand ("Complaint") filed by plaintiff Stephen Vatner ("plaintiff") in the above-captioned matter, in accordance with the numbered Paragraphs thereof, as follows:

## AS TO PARTIES

1. Defendants admit the allegations set forth in Paragraph 1 of the Complaint.

2. Defendants admit the allegations set forth in Paragraph 2 of the Complaint.

3. Defendants admit the allegations set forth in Paragraph 3 of the Complaint.

## AS TO FACTS COMMON TO ALL COUNTS

4.      Defendants admit that by letter dated June 20, 2000, plaintiff was offered a position as Professor with tenure in the Department of Medicine and refer to that letter for the contents thereof. Except as so stated, defendants deny the allegations of Paragraph 4.

5.      Defendants refer to the June 20, 2000 letter for the contents thereof. Except as so stated, defendants deny the allegations of Paragraph 5.

6.      Defendants admit that by letter dated June 24, 2002, plaintiff was appointed Chair of the Department of Cell Biology and Molecular Medicine and refer to that letter for the contents thereof. Except as so stated, defendants deny the allegations of Paragraph 6.

7.      Defendants admit the allegations set forth in Paragraph 7 of the Complaint.

8.      Defendants deny the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendants admit that the Department of Cell Biology and Molecular Medicine's rank among peer departments based on National Institute of Health funding has increased since 2000. Defendants deny knowledge or information sufficient to form a belief as to the remaining allegations and, therefore deny same and leave plaintiff to his proofs thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 9.

10.     Defendants deny the allegations set forth in Paragraph 10 of the Complaint.

11.     Defendants deny the allegations set forth in Paragraph 11 of the Complaint.

12.     Defendants deny the allegations set forth in Paragraph 12 of the Complaint.

13.     Defendants deny the allegations set forth in Paragraph 13 of the Complaint.

14.     Defendants admit that the Department of Cell Biology and Molecular Medicine purchased equipment from a current employee of UMDNJ contrary to UMDNJ policy. Except as

2

so stated, defendants deny the allegations set forth in Paragraph 14.

15.    Defendants admit that Dr. Vatner received a reprimand for his role in the procurement of equipment for the Department of Cell Biology and Molecular Medicine, which procurement was contrary to UMDNJ policy. Defendants further state that plaintiff has not identified the individuals to whom he refers as "responsible for procurement" thereby precluding a response to that allegation which is therefore denied, leaving plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 15.

16.    Defendants admit that Dr. Vatner was disciplined for his violation of University policy. Except as so stated, defendants deny the allegations set forth in Paragraph 16.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 17 and, therefore, deny same and leave plaintiff to his proofs thereon.

18.    Defendants admit that throughout 2008, Dean Johnson and plaintiff had several meetings during which a variety of topics were discussed. As to plaintiff's allegation that he met with other Chairs at UMDNJ, defendants state that they lack knowledge or information sufficient to form a belief as to the truth or falsity thereof, including the identity of the Chairs to which plaintiff refers and, therefore, deny same and leave plaintiff to his proofs thereon. Except as so stated, defendants deny the allegations set forth in Paragraph 18 of the Complaint.

19.    Defendants deny the allegations set forth in Paragraph 19 of the Complaint.

20.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the

3

allegations set forth in Paragraph 20.

21.     Defendants deny the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 22 and, therefore, deny same and leave plaintiff to his proofs thereon.  Except as so stated, defendants deny the allegations set forth in Paragraph 22.

23.     Defendants deny the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendants admit that on or about January 8, 2009, Geoffrey Seeger of the Department of Cell Biology and Molecular Medicine forwarded an email to Rhonda Farber, Director Ethics Program/Ethics Liaison Officer, among others, relating to charges for use of space at the University and refer to said email for its contents.  Except as so stated, defendants deny the allegations set forth in Paragraph 24.

25.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 25 and, therefore, deny same and leave plaintiff to his proofs thereon.  Except as so stated, defendants deny the allegations set forth in Paragraph 25.

26.     Defendants admit that David Roe, CFO of the New Jersey Medical School, sent a memorandum to plaintiff as Chair of the Department of Cell Biology and Molecular Research dated January 12, 2009, and refer to that memorandum for its contents.  Except as so stated, defendants deny the allegations set forth in Paragraph 26.

27.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27 and, therefore, deny same and leave plaintiff to

his proofs thereon. Except as so stated, Defendants deny the allegations set forth in Paragraph 27.

28.     Defendants deny the allegations set forth in Paragraph 28 of the Complaint.

29.     Defendants admit that David Roe, CFO of the New Jersey Medical School, sent a memorandum to plaintiff as Chair of the Department of Cell Biology and Molecular Medicine dated January 29, 2010, and refer to that memorandum for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 29.

30.     Defendants admit that plaintiff submitted a memorandum dated February 23, 2010, to Catherine M. Bolder, Associate Vice President, Workplace Diversity, regarding his request for business class travel and refer to that memorandum for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 30.

31.     Defendants admit that plaintiff contacted the University Ombudsman, Neil Schorr, regarding certain concerns raised by plaintiff. Except as so stated, defendants deny the allegations set forth in Paragraph 31.

32.     Defendants admit that Neil Schorr met with plaintiff as the University's Ombudsman. Except as so stated, defendants deny the allegations set forth in Paragraph 32.

33.     Defendants admit that plaintiff was granted permission to travel abroad in or about March 2010, purportedly in connection with certain research projects in which plaintiff was involved. Except as so stated, defendants deny the allegations set forth in Paragraph 33.

34.     Defendants admit that in a memorandum from Dean Johnson dated March 4, 2010, plaintiff was notified that the approval for his travel to Manila and Hong Kong was revoked and refer to that memorandum for its contents. Except as so stated, defendants deny the

5

allegations set forth in Paragraph 34.

35.     Defendants admit that plaintiff offered to take vacation during the portion of the trip to Manila, Philippines.  Except as so stated, defendants deny the allegations set forth in Paragraph 35.

36.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 36 and, therefore, deny same and leave plaintiff to his proofs thereon.  Except as so stated, defendants deny the allegations set forth in Paragraph 36.

37.     Defendants deny the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendants deny sufficient knowledge or information as to what plaintiff "believed" and therefore, deny same and leave plaintiff to his proofs thereto.  Except as so stated, defendants deny the allegations set forth in Paragraph 38.

39.     Defendants deny sufficient knowledge or information as to what plaintiff "believed" and therefore, deny same and leave plaintiff to his proofs thereto.  Except as so stated, defendants deny the allegations set forth in Paragraph 39.

40.     Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendants admit that plaintiff received a suspension of ten working days, which suspension was communicated to him by letter from Dean Johnson dated March 26, 2010, and defendants refer to that letter for its contents.  Except as so stated, defendants deny the allegations set forth in Paragraph 41.

42.     Defendants admit that plaintiff did not receive written charges of the allegations against him or a hearing prior to the issuance of his ten day suspension, but deny that he was

entitled to any such procedures. Defendants deny that plaintiff did not have an opportunity to respond to the allegations. Except as so stated, defendants deny the allegations set forth in Paragraph 42.

43.     Defendants admit that plaintiff was provided with an Executive Summary regarding an investigation into allegations that Dr. Vatner violated UMDNJ policies regarding purchasing and research protocol and refer to that document for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 43.

44.     Defendants admit that plaintiff submitted a purported response dated October 20, 2010, to the Executive Summary and refer to that document for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 44.

45.     Defendants admit that on or about March 26, 2010, the Newark Committee on Research Integrity, which was chaired by Dr. Anthony Forrester, initiated a Preliminary Assessment of an allegation relating to plaintiff. Except as so stated, defendants deny the allegations set forth in Paragraph 45.

46.     Defendants deny the allegations set forth in Paragraph 46 of the Complaint.

47.     Defendants deny the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendants admit that UMDNJ maintains by-laws and refers to said by-laws for their contents. Except as so stated, defendants deny the allegations set forth in Paragraph 48 of the Complaint.

49.     Defendants state that the Institutional Animal Care and Use Committee ("IACUC") commenced an investigation into allegations of research misconduct related to plaintiff, which allegations were received by the IACUC on or about March 25, 2010. Except as

so stated, defendants deny the allegations set forth in Paragraph 49.

50.     Defendants admit that members of the Department of Cell Biology and Molecular Medicine were interviewed in connection with the IACUC investigation.  Except as so stated, defendants deny the allegations set forth in Paragraph 50.

51.     Defendants deny the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations that certain blood tests were not performed and what effect, if any, the failure to perform such tests had on the outcome of the canine.  Except as so stated, defendants deny the allegations set forth in Paragraph 52.

53.     Defendants admit that plaintiff's privileges regarding canine research were revoked in May 2010.  Except as so stated, defendants deny the allegations set forth in Paragraph 53.

54.     Defendants admit that plaintiff submitted a purported response to the IACUC report.  Except as so stated, defendants deny the allegations set forth in Paragraph 54.

55.     Defendants deny the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 56 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto.  Except as so stated, defendants deny the allegations set forth in Paragraph 56.

57.     Defendants admit that for a period of time plaintiff served on a committee to screen candidates for the position of Dean of the New Jersey Medical School.  Except as so stated, defendants deny the allegations set forth in Paragraph 57.

8

58.     Defendants admit the allegations set forth in Paragraph 58 of the Complaint, except to state that Defendant Johnson is not Interim Dean.

59.     Defendants deny the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the opinions of plaintiff and other committee members set forth in Paragraph 60 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 60.

61.     Defendants admit that Dean Johnson was appointed Dean of the New Jersey Medical School. Except as so stated, defendants deny the allegations set forth in Paragraph 61.

62.     Defendants admit that by letter dated March 29, 2011, Dean Johnson informed plaintiff that he had not been reappointed as Chair of the Department of Cell Biology and Molecular Medicine. Except as so stated, defendants deny the allegations set forth in Paragraph 62.

63.     Defendants admit the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendants admit that Dean Johnson issued plaintiff a letter of reprimand on or about March 29, 2011, and refer to that letter for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 64.

65.     Defendants admit that prior to the reprimand being issued, he was not provided written charges of the allegations or a hearing to confront witnesses, but deny that plaintiff was entitled to any such procedures. Defendants deny that plaintiff did not have an opportunity to respond to the allegations. Except as so stated, defendants deny the allegations set forth in Paragraph 42.

Except as so stated, defendants deny the allegations set forth in Paragraph 65.

66.     Defendants admit that Dean Johnson sent plaintiff a letter dated June 8, 2011, and refer to that letter for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 66.

67.     Defendants deny the allegations set forth in Paragraph 67 of the Complaint.

68.     Defendants deny the allegations set forth in Paragraph 68 of the Complaint.

69.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 69 and, therefore, deny same and leave plaintiff to his proofs thereon. Except as so stated, defendants deny the allegations set forth in Paragraph 69.

70.     Defendants deny the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 71.

72.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 72 and, therefore, deny same and leave plaintiff to his proofs thereon. Except as so stated, defendants deny the allegations set forth in Paragraph 72.

73.     Defendants deny the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendants admit that performance reviews at UMDNJ become part of an employee's personnel file. Except as so stated, defendants deny the allegations set forth in Paragraph 74.

75.     Defendants deny the allegations set forth in Paragraph 75 of the Complaint.

10

76.     Defendants deny any violation of UMDNJ policy with respect to the payment through NIH grant funding. Defendants further state that Paragraph 76 asserts a legal conclusion to which no response is required. Except as so stated, defendants deny the allegations set forth in Paragraph 76.

77.     Defendants admit that by letter dated July 15, 2011, plaintiff sent a request to the Chair of Board of Trustees of UMDNJ and refer to said letter for its contents. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation that plaintiff sent such letter to the New Jersey Commission on Higher Education. Except as so stated, defendants deny the allegations set forth in Paragraph 77.

78.     Defendants admit that on or about September 20, 2011, the Board of Trustees of UMDNJ held a Board of Trustees meeting but deny sufficient knowledge related to plaintiff's "belief" or "understanding" and, thus, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 78.

79.     Defendants deny the allegations set forth in Paragraph 79 of the Complaint.

80.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 80 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 80.

81.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto. Except as so stated, defendants deny the allegations set forth in Paragraph 81.

11

82.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 82 of the Complaint and, therefore, deny same and leave plaintiff to his proofs with respect thereto.   Except as so stated, defendants deny the allegations set forth in Paragraph 82.

## AS TO COUNT ONE

### (Complaint in Lieu of Prerogative Writ)

83.     In response to Paragraph 83 of the Complaint, defendants repeat and reallege their responses to Paragraphs 1 through 82 as if fully set forth at length herein.

84.     Defendants state that the allegations in Paragraph 84 constitute legal conclusions to which no response is required.  Except as so stated, defendants deny the allegations set forth in Paragraph 84.

85.     Defendants deny the allegations set forth in Paragraph 85 of the Complaint.

86.     Defendants deny the allegations set forth in Paragraph 86 of the Complaint.

87.     Defendants state that the allegations in Paragraph 87 constitute legal conclusions to which no response is required.  Except as so stated, defendants deny the allegations set forth in Paragraph 87.

88.     Defendants admit the allegations set forth in Paragraph 88 of the Complaint.

89.     Defendants admit that it has not submitted this dispute to the Office of Administrative Law, but deny that the University had any obligation to do so.  Except as so stated, defendants deny the allegations set forth in Paragraph 89.

Defendants deny plaintiff is entitled to the relief sought in the ad damnum clause of Count One of the Complaint.

12

## AS TO COUNT TWO

### (Breach of Contract)

90.     In response to Paragraph 90 of the Complaint, defendants repeat and reallege their responses to Paragraphs 1 through 89 as if fully set forth at length herein.

91.     Defendants deny the allegations set forth in Paragraph 91 of the Complaint.

92.     Defendants deny the allegations set forth in Paragraph 92 of the Complaint.

93.     Defendants admit that counsel for plaintiff forwarded to UMDNJ a letter dated August 5, 2011, and refer to that letter for its contents. Except as so stated, defendants deny the allegations set forth in Paragraph 93.

94.     Defendants state that the allegations set forth in Paragraph 94 constitute legal conclusions to which no response is required. Except as so stated, defendants deny the allegations set forth in Paragraph 94.

95.     Defendants deny the allegations set forth in Paragraph 95 of the Complaint.

Defendants deny plaintiff is entitled to the relief sought in the ad damnum clause of Count Two of the Complaint.

## AS TO COUNT THREE

### (New Jersey Conscientious Employee Protection Act as to UMDNJ)

96.     In response to Paragraph 96 of the Complaint, defendants repeat and reallege their responses to Paragraphs 1 through 95 as if fully set forth at length herein.

97.     Defendants deny the allegations set forth in Paragraph 97 of the Complaint.

98.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and, therefore, deny same and leave plaintiff to

his proofs with respect thereto.  Except as so stated, defendants deny the allegations set forth in Paragraph 98.

99.     Defendants deny the allegations set forth in Paragraph 99 of the Complaint.

100.     Defendants deny the allegations set forth in Paragraph 100 of the Complaint.

Defendants deny plaintiff is entitled to the relief sought in the ad damnum clause of Count Three of the Complaint.

## AS TO COUNT FOUR

### (New Jersey Conscientious Employee Protection Act as to Robert Johnson)

101.     In response to the allegations of Paragraph 101 of the Complaint, defendants repeat and reallege their responses to Paragraphs 1 through 100 as if fully set forth at length herein.

102.     Defendants deny the allegations set forth in Paragraph 102 of the Complaint.

103.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 and, therefore, deny same and leave plaintiff to his proofs with respect thereto.  Except as so stated, defendants deny the allegations set forth in Paragraph 103.

104.     Defendants deny the allegations set forth in Paragraph 104 of the Complaint.

105.     Defendants deny the allegations set forth in Paragraph 105 of the Complaint.

Defendants deny plaintiff is entitled to the relief sought in the ad damnum clause of Count Four of the Complaint.

14

### AS TO THE DEMAND FOR JURY TRIAL

Defendants deny that trial by jury is appropriate or permissible as to certain of plaintiff's claims.

### FIRST SEPARATE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND SEPARATE DEFENSE

Plaintiff has been provided all process to which he was due, if any.

### THIRD SEPARATE DEFENSE

Plaintiff failed to exhaust all administrative remedies available to him.

### FOURTH SEPARATE DEFENSE

Plaintiff claims, or certain of them, are barred due to his failure to comply with R. 4:69-1, et seq.

### FIFTH SEPARATE DEFENSE

Claimant's claims or certain of them are barred by the parole evidence rule.

### SIXTH SEPARATE DEFENSE

There is lack of consideration for plaintiff's claims, or certain of them.

### SEVENTH SEPARATE DEFENSE

Plaintiff lacks standing as to the claims alleged in the Complaint, or certain of them.

### EIGHTH SEPARATE DEFENSE

As a result of his own acts, conduct and omissions, plaintiff is barred and estopped from asserting the claims alleged in the Complaint, or certain of them.

## NINETH SEPARATE DEFENSE

Plaintiffs' claims, or certain of them, are barred by the applicable statutes of limitations.

## TENTH SEPARATE DEFENSE

Any injury caused to plaintiff was due in whole or in part to plaintiff's own actions, inaction, and/or the negligence or acts of third parties.

## ELEVENTH SEPARATE DEFENSE

To the extent plaintiff's claims for damages are based upon any emotional, mental and physical injuries, such claims are barred by the exclusivity provisions of the New Jersey Workers' Compensation Act, N.J.S.A. 34:15-8.

## TWELFTH SEPARATE DEFENSE

Any objections that may have been raised by plaintiff in the course of his employment with the University and/or as the Principle Investigator on certain NIH funded grants were raised in the course and scope of his employment or responsibility as Principle Investigator and therefore are not entitled to protection provided under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 through -8.

## THIRTEENTH SEPARATE DEFENSE

Plaintiff's claim for punitive damages is barred by applicable law and, in any event, is precluded by the Due Process Clauses of the Federal and New Jersey Constitutions.

## FOURTEENTH SEPARATE DEFENSE

Defendants engaged in good faith efforts to comply with the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., and, therefore, plaintiff fails to state a claim for punitive damages.

16

## FIFTEENTH SEPARATE DEFENSE

On information and belief, plaintiff has failed to mitigate his damages, if any.

## SIXTEENTH SEPARATE DEFENSE

Defendants reserve the right to amend or supplement their Answer or to assert additional defenses at or before trial as additional information is obtained through investigation and discovery.

**WHEREFORE**, Defendants University of Medicine and Dentistry of New Jersey and Dean Robert Johnson demand judgment dismissing the Complaint in its entirety and awarding them attorneys' fees and costs incurred in defending this action.

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP.
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey and Dean Robert Johnson

By:_____

JOHN J. PEIRANO
A Member of the Firm

DATED: February 10, 2012

17

## CERTIFICATION PURSUANT TO RULE 4:6

The undersigned hereby certifies that the within Answer to First Amended Complaint, Complaint in Lieu of Prerogative Writ is filed and served within the time allowed by Rule 4:6 as extended through the Stipulation attached hereto.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
   CARPENTER, LLP
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey
and Dean Robert Johnson

By: _____
     JOHN J. PEIRANO

DATED: February 10, 2012

18

## CERTIFICATION PURSUANT TO RULE 4:5-1

In accordance with R. 4:5-1, I certify that, based upon the information currently in our possession, the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding, and that we know of no other person or persons at this time who should be joined in this action.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
    CARPENTER, LLP
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey
and Dean Robert Johnson

By: _____
     JOHN J. PEIRANO

DATED: February 10, 2012

19

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, John J. Peirano, Esq., of McElroy, Deutsch, Mulvaney & Carpenter, LLP, is hereby designated as trial counsel for defendants, University of Medicine and Dentistry of New Jersey and Dean Robert Johnson.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
   CARPENTER, LLP
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey
and Dean Robert Johnson

By: _____
     JOHN J. PEIRANO
     A Member of the Firm

DATED: February 10, 2012

20

## REQUEST FOR STATEMENT OF DAMAGES

Pursuant to R. 4:5-2, defendants University of Medicine and Dentistry of New Jersey and

Dean Robert Johnson hereby request that plaintiff specifies his damages within five (5) days of

the service of this request.

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey
and Dean Robert Johnson

By:_____
JOHN J. PEIRANO
A Member of the Firm

DATED: February 10, 2012

21

## CERTIFICATION OF SERVICE AND FILING

I hereby certify that I caused to be served on this date a true and correct copy of Defendants University of Medicine and Dentistry of New Jersey and Dean Robert Johnson's Answer to First Amended Complaint, Complaint in Lieu of Prerogative Writ and Jury Demand with attached Certifications, Demand for Statement of Damages and Designation of Trial Counsel, and the accompanying Case Information Statement, upon:

> James Prusinowksi, Esq.
> Knapp, Trimboli & Prusinowski, LLC
> 210 Park Avenue, Suite 302
> Florham Park, New Jersey 07932
> jprusinowski@ktplawyers.com

by Federal Express and by electronic mail.

I further certify that I have caused to be filed the original and one copy of the aforesaid documents with the Clerk of the Superior Court, Law Division, Essex County, by mailing the same this date by Federal Express.

MICHAEL J. DEE

DATED: February 10, 2012

22

**EXHIBIT** C

McELROY, DEUTSCH, MULVANEY
  & CARPENTER, LLP
1300 Mt. Kemble Avenue
Morristown, New Jersey 07962
Telephone: (973) 993-8100
Facsimile: (973) 425-0161
Attorneys for Defendants,
University of Medicine and Dentistry of New Jersey and
Dr. Robert Johnson



MAR – 7 2012

Rachel Davidson, J.S.C.

| | |
|---|---|
| DR. STEPHEN VATNER,<br><br>          Plaintiff,<br><br>vs.<br><br>BOARD OF TRUSTEES OF THE<br>UNIVERSITY OF MEDICINE AND<br>DENTISTRY OF NEW JERSEY, and<br>DR. ROBERT JOHNSON,<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY<br>DOCKET NO.: ESX-L-8827-11<br><br><br>Civil Action<br><br><br>ORDER   (2 MOTIONS) |

This matter having been opened to the Court by Knapp, Trimboli & Prusinowski, LLC,

attorneys for plaintiff Stephen Vatner, on a Motion to Vacate Discipline or Remit to OAL for

Hearing and by way of cross-motion by McElroy, Deutsch, Mulvaney & Carpenter, LLC,

attorneys for defendants University of Medicine and Dentistry of New Jersey and Dr. Robert

Johnson, to dismiss Count I of plaintiff's First Amended Complaint pursuant to R. 4:6-2(e), and

the Court having considered the papers submitted and having heard the arguments of counsel, ~~if~~ on

3-2-12)
~~any~~ and for good cause shown;

      IT IS on this 7th day of MARCH , 2012;

1

ORDERED that plaintiff's Motion to Vacate Discipline or Remit to OAL for Hearing be and hereby is denied; and

IT IS FURTHER ORDERED that defendants' Cross-Motion to Dismiss Count I of Plaintiff's First Amended Complaint be and hereby is granted; and

IT IS FURTHER ORDERED that Count I of plaintiff's First Amended Complaint hereby is dismissed in its entirety, with prejudice; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within 7 days of receipt by McElroy, Deutsch, Mulvaney & Carpenter, LLP.

                                                           _Rachel N Davidson_
                                                                        J.S.C.
Opposed        (X)
Unopposed      (  )          Hon. Rachel N. Davidson, J.S.C.


Reasons:

In this case, plaintiff claims that he is entitled to a tenure hearing pursuant to N.J.S.A. 18A:6-18. Plaintiff, a UMDNJ professor, argues that the statute applies to him as a professor in a "State college." Chapter 6, entitled "General Provisions Relating to Education," does not define "state college." Defendants point to N.J.S.A. 18A:3B-3, which defines UMDNJ as a "public research university" and not as a "state college." Plaintiff counters that N.J.S.A. 18A:3B-3 is part of the Higher Education Restructuring Act of 1994 and N.J.S.A. 18A:3B-3's definitions are explicitly intended for that act only.

There is nothing in Title 18A to suggest that UMDNJ professors are or were intended to be covered by the provisions of N.J.S.A. 18A:6-19. Title 18A was enacted as a general revision to New Jersey's laws relating to education and was made effective on January 11, 1968. This new title included N.J.S.A. 18A:6-18, on which plaintiff relies, as well as N.J.S.A. 18A:62-1, which defines "public institutions of higher education." In

2

defining these institutions, N.J.S.A. 18A:62-1 distinguished between "the six state colleges" and "the New Jersey college of medicine and dentistry." Thus, in 1967, when the Legislature enacted N.J.S.A. 18A:6-18, it distinguished between state colleges and UMDNJ. Therefore, the reference to state colleges in N.J.S.A. 18A: 6-18 cannot be understood to include UMDNJ.

**EXHIBIT** D

Knapp, Trimboli & Prusinowski, LLC
210 Park Ave, Suite 302
Florham Park, NJ 07932
973-660-1095
973-660-1096 (fax)
Attorneys for Plaintiff, Dr. Stephen Vatner

```
F I L E D
APR 1 6 2012
Rachel Davidson, J.S.C.
```

DR. STEPHEN VATNER,                    :     SUPERIOR COURT OF NEW JERSEY
                                       :     LAW DIVISION, ESSEX COUNTY
               Plaintiff,              :
                                       :     Dkt No.: ESX-L-8827-11
v.                                     :
                                       :     Civil Action
BOARD OF TRUSTEES OF THE              :
UNIVERSITY OF MEDICINE AND            :     ORDER
DENTISTRY OF NEW JERSEY, and          :
DR. ROBERT JOHNSON                    :
                                       :
               Defendants.             :

This matter having been opened to the Court by Plaintiff Dr. Stephen Vatner,

M.D., through his counsel, James T. Prusinowski, Esq., to obtain leave to file an amended

pleading; on notice to all counsel; and having considered the moving papers and any

reply papers; and for good cause showing;

        IT IS ON THIS 16th DAY OF APRIL, 2012                    —and serve

        ORDERED that Plaintiff, Dr. Stephen Vatner, is granted leave to file/a second

amended complaint within fourteen (14) days of the date of this Order; and

        IT IS FURTHER ORDERED that a copy of this Order shall be served upon all

parties within seven (7) days.

                                              _____
                                                          J.S.C.
Opposed ( )
Unopposed (✓)
Brinkerhoff Vatner, Stephen Dr. UMDNJ Litigation/Motions Order.docx

**EXHIBIT** E

**Knapp, Trimboli & Prusinowski, LLC**
210 Park Ave, Suite 302
Florham Park, NJ 07932
973-660-1095
973-660-1096 (fax)
Attorneys for Plaintiff, Dr. Stephen Vatner

| | |
|---|---|
| DR. STEPHEN VATNER, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION, ESSEX COUNTY |
| Plaintiff, | |
| | **Dkt No.: ESX-L-8827-11** |
| v. | |
| | **Civil Action** |
| BOARD OF TRUSTEES OF THE | |
| UNIVERSITY OF MEDICINE AND | **SECOND AMENDED COMPLAINT, JURY** |
| DENTISTRY OF NEW JERSEY, and | **DEMAND, DESIGNATION OF TRIAL** |
| DR. ROBERT JOHNSON | **COUNSEL** |
| | |
| Defendants. | |

Plaintiff Dr. Stephen Vatner, located at 15 West 72nd Street, Apt. #34C, New York, New

York, by way of Complaint says:

**PARTIES**

1.     Defendant, University of Medicine and Dentistry of New Jersey ("UMDNJ"), is a

University in the State of New Jersey with its principal place of business located at 65 Bergen

Street, Newark, New Jersey, 07101.

2.     Defendant Robert Johnson, M.D., is the Dean of New Jersey Medical School and

an employee of UMDNJ.

3.     Plaintiff, Stephen Vatner, M.D., is currently employed by the Defendant as a

tenured Professor and Director of the Cardiovascular Research Institute ("CVRI").

**FACTS COMMON TO ALL COUNTS**

4.     On or about June 20, 2000, Plaintiff and Defendant, UMDNJ, entered into a

contractual agreement, which stipulated that Plaintiff would be employed as a Professor with

1

tenure in the Department of Medicine.

5.      Plaintiff's contract with UMDNJ called for Plaintiff's department, Cardiovascular Research Institute (CVRI), to receive funding in the amount of $1.5 million per year guaranteed for at least three years.

6.      A subsequent agreement between Plaintiff and UMDNJ dated June 24, 2002 required the annual funding of $1 million to support the CVRI.

7.      On or about December 31, 2002, the Board of Trustees of UMDNJ approved Plaintiff as Chair of the Department of Cell Biology and Molecular Medicine (CBMM) at UMDNJ.

8.      Plaintiff did not receive a raise in his base salary as a result of his appointment to the position of Chair, nor did he receive an administrative stipend or any other additional pay based upon his appointment as chair.

9.      During Plaintiff's tenure, he has successfully raised CBMM from the bottom 10% to the top 5% nationally based upon National Institute of Health funding among peer departments.  This rating is directly attributable to Plaintiff's outstanding work as Chair of the Department.

10.     On or about July 31, 2003, Plaintiff and Defendant entered into an agreement to restructure the June 24, 2002 agreement between the parties.

11.     The July 31, 2003 agreement called for funding of $3.38 million for the fiscal years 2004 and 2005.

12.     On or about April 22, 2005, Plaintiff and UMDNJ entered into a new agreement calling for funding of CVRI in the amount of at least $3 million for the fiscal years of 2006, 2007, and 2008.

13.     A March 14, 2007 Agreement was executed between the Plaintiff and UMDNJ calling for funding in the amount of $3.053 million per year for CVRI for the fiscal years 2009, 2010, 2011, and 2012.

14.     In 2008, without Dr. Vatner's authorization, the Department of Cell Biology and Molecular Medicine purchased equipment from an employee. The equipment was necessary for the department and was significantly cheaper than if it was procured through other means.

15.     Even though the equipment was not authorized by Dr. Vatner, he was reprimanded for it having been purchased whereas the individuals responsible for procurement were not disciplined.

16.     The transaction at issue saved a significant amount of UMDNJ's NIH funding and New Jersey funds dedicated to the University; however, Dr. Vatner was disciplined for this having occurred.

17.     Dr. Vatner raised his concerns with the procedures for procuring equipment and other necessary items to compliance lawyers and specifically referenced the waste of NIH funding and public funds based upon the procedures utilized by UMDNJ.

18.     Throughout much of 2008, Plaintiff participated in meetings with Defendant Dean Johnson and other chairs in the University during which Dr. Vatner pressed to have higher administration standards, greater rigor in the curriculum and a reduction in unproductive faculty and staff.

19.     Dr. Vatner's suggestions were rebuffed by the University administration.

20.     On or about December 12, 2008, Plaintiff informed the UMDNJ Ethics Liaison Officer about purchasing irregularities with regard to National Institute of Health (NIH) funds.

21.     Raising this issue led to a reprimand of Plaintiff by UMDNJ.

3

22.     Plaintiff requested authorization to raise his concerns regarding the billing issues as to the use of NIH funds with the Governor's office and Plaintiff's concern that UMDNJ was imposing arbitrary restrictions on Plaintiff's department which resulted in millions of dollars of NIH grant money being wasted.

23.     The UMDNJ Ethics Liaison forcefully discouraged Plaintiff from providing information about the incident to the Governor's office.

24.     On or about January 8, 2009, Plaintiff disclosed to UMDNJ Compliance Officials that New Jersey Medical School ("NJMS") was collecting duplicate funds for the use of space at their animal research facility.

25.     Plaintiff requested a return of the duplicate funds that his department had been paying. To the best of Plaintiff's knowledge the duplicate payments have continued.

26.     On or about January 12, 2009, New Jersey Medical School CFO, David Roe, sent a memo to Plaintiff informing Plaintiff that his departmental budget would be reduced by 20% beginning in July 2009 contrary to the contractual obligations the Medical School had previously agreed to regarding funding.

27.     Also in 2009, Dr. Vatner raised concerns regarding perceived conflict of interests on the part of Senior Associate Dean for the Graduate School of Biomedical Sciences.  Such conflicts of interest were not corrected or eliminated.

28.     On or about March 11, 2009 Plaintiff and UMDNJ entered into an agreement amending the March 14, 2007 agreement, which decreased UMDNJ's support to the Department for the fiscal year of 2010 by $610,600.

29.     In January 2010, Defendant Dean Johnson and CFO Roe again informed Dr. Vatner that his departmental budget was to be reduced for academic year beginning July 1, 2010.

4

This reduction in funding was contrary to the contractual obligations the Medical School agreed to with Dr. Vatner.

30.     On or about February 2010, Plaintiff submitted a request for business class travel accommodations so Plaintiff could travel abroad to attend to medical research. The special accommodations were due to a physical condition Plaintiff has.

31.     The Office of Workplace Diversity at UMDNJ questioned Plaintiff in a pointed and intrusive manner about this condition. As a result of the interrogation, Plaintiff called the University Ombudsman to express his concerns.

32.     After divulging specific information concerning this and other issues Plaintiff was having within UMDNJ, the University Ombudsman, Neil Schorr, informed Plaintiff he held the position of Vice President for Investigations at UMDNJ, not his former position of Obmudsman. The position change should have been disclosed to Dr. Vatner prior to any specific information concerning Dr. Vatner's issues and concerns being provided to him since Schorr's position as Vice President of Investigations was completely antithetical to being an ombudsman. Opposed to being an advocate for University facility, Schorr was the individual responsible for initiating and conducting UMDNJ investigations.

33.     In March of 2010 Plaintiff was scheduled to, and received permission for travel abroad to address different research projects in which he was involved. Plaintiff's trip consisted of stops in France, Manila, and Australia.

34.     Shortly before embarking on this trip, Defendant, Dean Robert Johnson, revoked permission for Plaintiff to continue his collaborative work in Manila.

5

35.     As a result, Dr. Vatner repeated requested that he be allowed to use vacation time for his travel to Manila.  Further, Dr. Vatner confirmed in writing that no research would be performed while he was in Manila.

36.     Due to Dean Johnson's revocation of permission, Plaintiff did not pursue the research that was to be done in Manila.

37.     While Dr. Vatner was away, the Defendants initiated an investigation into Dr. Vatner and interviewed approximately twelve of Dr. Vatner's staff members concerning, *inter alia*, Dr. Vatner's research, travel, finances, purchasing practices, external business relationships, graduate education, and other issues.  ("Manila Investigation")

38.     It is believed that this investigation was initiated in whole or in part based upon information Dr. Vatner provided to Neil Schorr prior to Dr. Vatner leaving to attend to his research in France and Australia and vacationing near Manila.  Such information should not have been used against Dr. Vatner since he provided the information under the pretext that Schorr held the position of Ombudsman, not Vice President of Investigations.

39.     It is also believed that the investigation was initiated in whole or in part as a result of Dr. Vatner serving on the dean search committee and opposing Dr. Johnson for the permanent position.

40.     The investigation was further initiated based upon the concerns Dr. Vatner had raised concerning the misuse of NIH and New Jersey public funds.

41.     Upon Plaintiff's return from this trip, Plaintiff was unilaterally suspended without pay for ten working days, allegedly for violating the directive to refrain from pursuing, or in any way being involved in the Manila research.

6

42.     Prior to the discipline being imposed, Plaintiff was not given written charges of the allegations against him, did not have the opportunity to refute the allegations that formed the basis of this ten day suspension, nor did Plaintiff receive a hearing of any kind concerning implementation of this discipline, even though he contested the basis of the discipline.

43.     A report was provided to Dr. Vatner regarding the Manila Investigation with its conclusions in or about October 2010; however, Dr. Vatner only had seven days to respond to its findings and conclusions.

44.     Dr. Vatner provided a twenty page response to the report showing that the research in Manila which was criticized had been authorized by the University.

45.     On or about March 26, 2010, the Subcommittee of Campus Committee on Research Integrity, which was chaired by Dr. Anthony Forrester, opened an investigation regarding Dr. Vatner and preliminary data his team had acquired in several canine research procedures.

46.     This investigation resulted in several members of Dr. Vatner's staff being interviewed on multiple occasions.

47.     It was quickly concluded that there was no basis for the allegations; however, no final report on this was issued for another year.

48.     The UMDNJ by-laws require that the University correct the adverse effects of unwarranted allegations. Dr. Vatner has requested that the University correct the information which was disseminated during the investigation so that his reputation would be restored. This has not happened.

49.     On or about April 12, 2010, another investigation was initiated, this time by IACUC, regarding a canine surgery conducted in March. ("Canine Surgery Investigation")

7

50.     Several staff members were interviewed concerning this incident.

51.     UMDNJ issued a report to the United States Department of Agriculture which was inaccurate and did not provide all of the necessary information. Specifically, documents Dr. Vatner provided the investigators showing that it was Comparative Medicine Research's (CMR) responsibility to monitor the canine's blood work, which CMR did not perform properly.

52.     Additionally, due to UMDNJ previously not paying for services from the medical laboratory which was to perform the blood tests, the tests for the canines in question were not done. This led to the canine's demise. Had the blood chemistries been done, pursuant to customary procedures in patients postoperatively, the problem would have been diagnosed and corrected.

53.     As a result of this inaccurate report, Dr. Vatner's privileges regarding canine research were revoked in May 2010.

54.     Dr. Vatner submitted a letter in response to the IACUC report highlighting the inaccuracies of the report; however, the errors were not corrected.

55.     During most of 2010, routine transactions for Dr. Vatner's department were consistently delayed or blocked by the administration. Such refusal to approve routine transactions precluded Dr. Vatner and his department from performing effectively and efficiently.

56.     In July 2010, Dr. Vatner was informed by a staff member that due to all of the investigations and funding issues, she was concerned about the viability of the department; therefore, she was negotiating with another medical school future employment. Several other staff members resigned thereafter for similar reasons, which severely curtailed the ability of the department to operate appropriately and effectively.

8

57. During much of this time period, Plaintiff served on a committee to screen candidates for the position of Dean of New Jersey Medical School.

58. Defendant, Interim Dean Robert Johnson, M.D., was a candidate for this position.

59. During the interview process of the second dean search, Dr. Vatner inquired with interim Dean Johnson as to the Manila Investigation, and Interim Dean Johnson responded by saying that Dr. Vatner should not be concerned with it as everything was allegedly going to be "okay." Interim Dean Johnson further stated that a meeting regarding it would be held. This meeting never took place.

60. Plaintiff opposed Dr. Robert Johnson's appointment due to his lack of academic credentials. The vast majority of the committee members agreed with Dr. Vatner's assessment regarding Dean Johnson and felt Dean Johnson should not be appointed. As a result, Dean Johnson disbanded the search committee and established a new committee of members he picked in the fall of 2010.

61. Dr. Johnson was eventually appointed and has pursued a course of retaliation against Plaintiff ever since.

62. Shortly after his permanent appointment as Dean, Defendant Johnson removed Dr. Vatner as Chair of CBMM.

63. Dr. Junichi Sadoshima was appointed as interim chair to replace Dr. Vatner.

64. Subsequently and in addition to the ten day suspension, on or about March 29, 2011, Plaintiff was issued a formal letter of reprimand by Dean Johnson for the alleged improper research taking place in the Philippines.

65. Prior to the reprimand being issued, Plaintiff was not given written charges of the allegations against him, did not receive an opportunity to refute any of the allegations contained

in the formal letter of reprimand, nor was Plaintiff afforded a hearing to confront any of the witnesses who provided the alleged factual basis for this reprimand.

66.     On or about June 8, 2011, Plaintiff received a letter from Dean Robert L. Johnson stating that as a result of Plaintiff's removal as Chair of the Department of Cell Biology and Molecular Medicine, Plaintiff's salary would be reduced retroactive to March 30, 2011. (Attached as Exhibit 1).

67.     Plaintiff's salary was unilaterally reduced by fifty-five thousand dollars ($55,000). This decrease in salary caused Plaintiff's academic base salary to be reduced.

68.     Plaintiff was not provided an opportunity to contest this decrease in salary through a hearing or any other forum.

69.     On or about June 8, 2011, the new chair of CBMM, Dr. Junichi Sadoshima, prevented Plaintiff from accessing and utilizing the funds guaranteed to CVRI, through the various contracts Plaintiff executed with UMDNJ, even though Plaintiff continues to oversee CVRI.

70.     It was improper for Defendants to deny Dr. Vatner access to funds for CVRI due to his removal as chair.  Dr. Vatner's duties, including utilization of funds, for CVRI continue regardless of his position as department chair.

71.     On or about September 7, 2011, Plaintiff, after having made several requests directly to UMDNJ, contacted NIH regarding individuals who were being paid with NIH grant money but were not performing work with, for or on behalf of NIH grant projects.

72.     On or about September 9, 2011, Dr. Sadoshima informed Plaintiff that the request to remove the individuals from NIH grants had again been denied.

73.    A supervisor, Dr. Gause has issued an inaccurate performance review which addressed many issues that have been raised by Dr. Vatner on several occasions; however, Dr. Gause has failed and refused to change or correct the inaccurate information.

74.    This review becomes part of Dr. Vatner's permanent personnel file.

75.    Having negative reviews in his personnel file cause ongoing damage to his reputation and ability to perform at UMDNJ or any other institution.

76.    Requiring that the individuals be paid through NIH grant funding when such individuals were not eligible is a violation of UMDNJ policy and United States law.

77.    On or about July 15, 2011, Plaintiff caused to be sent to the Chair of the Board of Trustees of UMDNJ and the Chair of the New Jersey Commission for Higher Education ("NJCHE") a request that the disciplinary matters be referred to the Office of Administrative Law ("OAL") for a formal hearing. (Attached as Exhibit 2).

78.    On or about September 20, 2011, the Board of Trustees of UMDNJ held a Board of Trustees meeting. Pursuant to the public notice for this September 20, 2011 Board Meeting, it is believed and understood that the issues raised by Plaintiff were to be addressed.

79.    The Board of Trustees of UMDNJ failed to take any action regarding Plaintiff's request for his disciplinary issues to be heard and provide Plaintiff the opportunity to refute the charges leveled against him in a serious manner.

### COUNT ONE
### (42 U.S.C.A. § 1983)

80.    Plaintiff repeats and incorporates the above claims as if set forth herein.

11

81.     As a tenured professor of a New Jersey University, Plaintiff cannot be disciplined without appropriate procedural due process being provided pursuant to Plaintiff's Constitutional rights under the Fourteenth Amendment.

82.     The required due process includes being served with written charges, being presented with the evidence against him, confronting witnesses and being allowed to present defenses to the claims.

83.     Plaintiff has contested the arbitrary disciplinary action taken against him and requested that he be afforded an opportunity to voice his opposition to these actions by appropriate process as guaranteed to him under the Fourteenth Amendment of the United States Constitution, 42 U.S.C.A. § 1983.

84.     Defendants have failed to take appropriate remedial action and therefore denied Plaintiff the due process rights afforded to him under 42 U.S.C.A. § 1983.

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of appropriate hearings, compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

**COUNT TWO**
**(Breach of Contract)**

85.     Plaintiff repeats and incorporates the above claims as if set forth herein.

86.     The parties entered into a series of valid enforceable contracts which provided, *inter alia*, a minimum level of funding for CVRI through the fiscal year of 2012.

87.     Defendant has breached its contractual obligations to Plaintiff by reducing the funding for CVRI and preventing Plaintiff from accessing and allocating CVRI funds.

12

88.     On or about, August 5, 2011, Plaintiff, through counsel, submitted a demand, in the form of a contract claim notice, to Defendant requiring that it cease its illegal actions.

89.     The time for Defendant to remedy its contractual violation pursuant to N.J.S.A. 59:13-1 et seq. and N.J.S.A. 18A:64G-3.10, expired on November 8, 2011.

90.     Defendant remains in violation of its contractual obligations to Plaintiff.

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

## COUNT THREE
### (New Jersey Conscientious Employee Protection Act as to UMDNJ)

91.     Plaintiff repeats and incorporates the above claims as if set forth herein.

92.     Plaintiff reported multiple instances of alleged misuse of NIH funds by UMDNJ to Dean Robert Johnson, possible double billing for use of space and concerns of conflicts of interests within the University.

93.     Plaintiff reasonably believes that the continued misuse of NIH funds by UMDNJ, billing issues, and failure to correct conflicts of interest were illegal and violate of law.

94.     As a result of reporting the illegal use of NIH funds, UMDNJ has engaged in a pattern of retaliatory action against Plaintiff including, *inter alia*, initiating investigations into his actions, failing to correct inaccurate information regarding Dr. Vatner in official reports, issuing unjust discipline against Plaintiff, refusing to provide Plaintiff a hearing as required by New Jersey statute, removal of Plaintiff his position as chair of the department, reducing Plaintiff's academic salary in violation of New Jersey statute, and the withholding of funds to be used by CVRI under Plaintiff's supervision.

95.    Such retaliatory actions are in violation of <u>N.J.S.A.</u> 34:19-1, <u>et. seq.</u>, the New Jersey Conscientious Employee Protection Act ("CEPA").

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, the Board of Trustees of the University of Medicine and Dentistry of New Jersey, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

**COUNT FOUR**
**(New Jersey Conscientious Employee Protection Act as to Robert Johnson)**

96.    Plaintiff repeats and incorporates the above claims as if set forth herein.

97.    Plaintiff reported multiple instances of alleged misuse of NIH funds by UMDNJ to Dean Robert Johnson, possible double billing for use of space and concerns of conflicts of interests within the University.

98.    Plaintiff reasonably believes that the continued misuse of NIH funds by UMDNJ, billing issues, and failure to correct conflicts of interest were illegal and violate of law.

99.    As a result of reporting the illegal use of NIH funds, Dean Johnson has engaged in a pattern of retaliatory action against Plaintiff including, *inter alia*, initiating and refusing to conclude investigations into his actions, issuing unjust discipline against Plaintiff, refusing to provide Plaintiff a hearing as required by New Jersey statute, removal of Plaintiff his position as chair of the department, reducing Plaintiff's academic salary in violation of New Jersey statute, and the withholding of funds to be used by CVRI under Plaintiff's supervision.

100.    Such retaliatory actions are in violation of <u>N.J.S.A.</u> 34:19-1, <u>et. seq.</u>, the New Jersey Conscientious Employee Protection Act ("CEPA").

**WHEREFORE**, Plaintiff, Dr. Stephen Vatner, demands judgment against Defendant, Dr. Robert Johnson, in the form of compensatory damages, punitive damages, attorneys fees, costs of suit, and any other remedy the court deems just and equitable.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury on all counts.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to the provisions of Rule 4:25-4, the Court is hereby advised that James T. Prusinowski, Esq., is designated as trial counsel.

## CERTIFICATION OF ATTORNEY

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action. R. 4:5-1.

> KNAPP, TRIMBOLI & PRUSINOWSKI, LLC
> Attorneys for Plaintiff,
> Dr. Stephen Vatner,
>
> James Prusinowski, Esq.

Dated: April 24, 2012
Data:clients:Vatner, Stephen Dr.:UMDNJ Litigation:Pleadings:Second Amended Complaint.docx

15

Exhibit 1



**NEW JERSEY
MEDICAL SCHOOL**

University of Medicine & Dentistry of New Jersey

Office of the Dean

June 8, 2011

Stephen Vatner, MD
15 West 72nd Street, Apt. #34C
New York, New York 10023

Dear Dr. Vatner:

This is a confirmation of our discussion on March 29, 2011 that effective March 30, 2011, you no longer serve as Chair, Department of Cell Biology and Molecular Medicine.

Effective March 30, 2011, your new academic base salary component as a full Professor and Director of Cardiovascular Research Institute will be $190,000; your Faculty Practice Salary Component will remain at $214,500. This Faculty Practice Salary Component will remain in effect for as long as you generate $135,000 in salary support from grant funding. To the extent that you have been overpaid since that date, we will be in touch with you concerning repayment.

As Director of CVRI, you will report to the Executive Director and the Senior Associate Dean for Research. As Director, you will be responsible to obtain extramural funding, coordinate integrative research among multiple investigators at multiple sites, publish papers, give presentations, and conduct graduate and postdoctoral training on the causes of heart disease and heart failure, the mechanisms of potential therapeutic agents, and novel therapeutic approaches.

As Director of CVRI, you serve in an administrative capacity at the will of the Dean. Should it happen that you no longer hold an administrative position at NJMS, your academic base salary will be adjusted and, any clinical salary supplement also will be adjusted to reflect your changed responsibilities. You remain outside the unit of employees represented by the American Association of University Professors (AAUP) because you will hold a faculty administrator position and the title and responsibilities of Director.

The duties and responsibilities of your position as full Professor and Director of CVRI will include, but are not limited to:

- Strengthen the Cardiovascular Research Institute's research and training programs;

- Establish goals and objectives for the research team, supervises laboratory operations, creates research policies and oversees quality control of research data under the direction of the Executive Director;

- Oversee the preparation of grant applications, progress reports, IACUC protocols, manuscripts, presentations and other scholarly output from the CVRI;

- Cultivate the independent creativity of faculty and trainees, and catalyzes inter-disciplinary collaborative grant applications with other members of the research

community;

- Develop innovative translational research programs in collaboration with clinical cardiologists, and oversees the related physician-scientist training program;

- Leverage the CVRI as a research platform for fostering multi-disciplinary interactions and collaborations that will transform patient care in the coming decade;

- In conjunction with the Executive Director, oversee planning of future projects to assure an ongoing grant portfolio. Identify new areas of potential research collaboration, design experiments and obtain preliminary data;

- Develop and oversee all CVRI core facilities including Biochemistry, Histology, Echocardiography, Rodent Surgery, Physiology, Research Engineering and Administration (finance and administrative support staff);

- Understand and adhere to UMDNJ's compliance standards as they appear in UMDNJ's Corporate Compliance Policy, Code of Conduct and Conflict of Interest Policy;

- Keep abreast of all federal, state and UMDNJ regulations, laws and policies as they presently exist and as they change or are modified;

- Perform other duties as assigned by the Chair.

Your annual performance evaluation will be completed by the Chair of the Department of Cell Biology and Molecular Medicine.

Please sign below indicating your acceptance of the terms of this letter.

We wish you continued success at UMDNJ-New Jersey Medical School.

Sincerely,

Robert L. Johnson, MD, FAAP
The Sharon and Joseph L. Muscarelle Endowed Dean

Accepted by:

_____

Stephen Vatner, MD

C:   Maria Soto-Greene, MD, FACP, Vice Dean
William Gause, PhD, Senior Associate Dean for Research
Junichi Sadoshima, MD, PhD, Interim Chair, Department of Cell Biology & Molecular Medicine.

Exhibit 2

KNAPP,
TRIMBOLI &
PRUSINOWSKI, LLC

*Please Respond to our New Jersey Office*

July 15, 2011

**Via UPS Overnight Mail**
Kevin M. Barry, M.D., M.B.A., Chair
Board of Trustees
University of Medicine and Dentistry of New Jersey
65 Bergen Street
Room 1535
University Heights
Newark, New Jersey 07101-1709

Re:     **Dr. Stephen Vatner – Disciplinary Action**

Dear Dr. Barry:

This office represents Dr. Stephen Vatner, a tenured professor with the University of Medicine and Dentistry of New Jersey. Several disciplinary actions have been taken against him recently which are in violation of his due process rights under applicable statute, and Dr. Vatner hereby demands that the discipline be vacated for failure to have followed the required procedures for these disciplinary actions. This includes a ten-day suspension with loss of salary that was imposed on March 29, 2010, a letter of reprimand issued on March 29, 2011, and a salary decrease effective June 8, 2011, which was retroactive to March 30, 2011.

Dr. Vatner is a tenured professor with UMDNJ and Director of the Cardiovascular Research Center (CVRI). Until recently, he also served as Chair of the Department of Cell Biology and Molecular Medicine. In these positions, he is required to engage in teaching duties as well as research.

In March 2010 Dr. Vatner was scheduled to travel abroad to address several research projects in which he was involved. This travel involved a stop in France to put together a prestigious LeDucq proposal, which requires French investigators and another was to continue collaborations with Dr Robert Graham in Australia, where Dr Graham's sabbatical to UMDNJ was arranged. An intermediate stop was scheduled for Manila, where the original intent was to do a collaborative research project. Initially, approval was granted by Dean Johnson for the entire trip and accordingly non-refundable tickets were booked. Shortly before leaving, Dean Johnson revoked permission for Dr Vatner to do the collaborative work in Manila. Accordingly, Dr Vatner agreed not to go to Manila for the research project. Instead, he used that portion of the trip to take vacation and visit a resort several hundred miles from Manila. Dr Vatner agreed to pay for the entire trip personally, including the other segments involving UMDNJ grant applications. Dean Johnson acknowledged this request and told Dr Vatner that he would get back to him and let him know if this was acceptable. At this point in time, Dr. Vatner had already booked all of his flights to go to the various locations, and the Philippines was the second of the

numerous stops. He could not change his travel plans, without significant cost in cancellation fees and due to the scheduling of events involving Professors at multiple institutions in Europe and Australia before and after the Manila trip. As such, Dr. Vatner used his personal vacation time and used his personal resources for the entire trip and did not charge the University any of the travel costs for any part of the trip and he did not attend to any of the research that was going on in Manila. Upon returning to New Jersey, he was unilaterally suspended for ten workdays without pay for having traveled to the Philippines. (Exhibit 1). Dr. Vatner did not have an opportunity to refute the allegations of this discipline and despite his repeated requests, Dr. Vatner did not receive a hearing of any kind concerning this discipline.

On March 29, 2011, Dr. Vatner was issued a letter of reprimand by Dean Johnson concerning the alleged improper research taking place in the Philippines. (Exhibit 2). Again, Dr. Vatner was not provided an opportunity to refute any of the allegations in the three page letter of reprimand nor was he provided an opportunity to have a hearing or confront any of the factual witnesses supposedly providing information concerning this research.

On or about March 30, Dr. Vatner was removed as Chair, Department of Cell Biology and Molecular Medicine. On June 8, 2011 Dr. Vatner received a letter from Dean Johnson providing that his salary would be reduced retroactive to March 30 in the amount of $55,000.00. (Exhibit 3). The letter implies that the reduction in salary was a result of his being removed as Chair. As set forth in the rebuttal letter submitted June 14, 2011, Dr. Vatner did not receive a salary increase for taking the position as Chair; therefore, the salary reduction was improper. (Exhibit 4). Once the salary reduction was implemented (Exhibit 5), Dr. Vatner's academic base was reduced in violation of his tenure rights and statutory law. As with the prior disciplines, Dr. Vatner was not provided an opportunity to contest the factual basis for the Dean's actions and has not been provided an opportunity to confront any of his accusers or have a meaningful hearing on the issues.

A professor at a state college or university who has tenure shall not be dismissed or subject to reduction of salary except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause. Written charges of the cause or causes preferred against an individual shall be signed by the person or persons making the same and file with the Board of Trustees of said college or school. N.J.S.A. 18A:6-18. Upon determination that the matter is a contested case, the Board shall assign the matter for hearing and an initial decision by the Office of Administrative Law. Id.

Dr. Vatner was not served with any charges in any of the above matters. Rather, the Dean unilaterally imposed disciplinary action against him in these three scenarios despite Dr. Vatner's tenure rights. Furthermore, Dr. Vatner adamantly contests the factual allegations of each of the three issues and when there are factual disputes of disciplinary action, the matter must be submitted to the Office of Administrative Law for a hearing, findings of fact and initial conclusions of law. This has not been done. As such, the University is in violation of its obligations under applicable statute to ensure that written charges are preferred against a tenured professor prior to the disciplinary action being taken. Further, the University is under an

Kevin M. Barry, M.D., M.B.A., Chair
July 15, 2011
Page 3 of 3

affirmative obligation to submit the disciplinary action to the Office of Administrative Law for determinations on the allegations.

Since the University has failed to perform its duties and obligations under the applicable statute, and since Dr. Vatner has been prejudiced by the University's failure to perform its obligations, these three disciplinary actions must be rescinded and vacated. Dr. Vatner should have ten days of pay restored to him, refunded the money he expended for the research trip, and the ten-day suspension should be removed from his file. Further, the written reprimand should be removed from his file and permanently destroyed. Finally, Dr. Vatner's original salary must be reinstated retroactive to March 30, 2011.

Should the University fail to remedy these actions, Dr. Vatner requires that this matter be submitted to the Office of Administrative Law for hearings on these issues and initial determinations rendered. We are submitting a copy of this letter to the New Jersey Commission of Higher Education and requesting that it also refer this matter to the Office of Administrative Law for proper proceedings.

Your prompt attention to this matter is appreciated.

Respectfully submitted,
Knapp, Trimboli & Prusinowski, LLC

James T. Prusinowski, Esq.

Attachments
cc:     Bradford Hildebrandt, Secretary – Via UPS Overnight
        Edward J. Graham, Chair, NJCHE     - Via UPS Overnight
JTP:crj

**EXHIBIT** F

# KNAPP, TRIMBOLI & PRUSINOWSKI, LLC

*Please Respond to New Jersey Office*

May 9, 2012

***Via Overnight Delivery***
Michael J. Dee
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075

      **Re:**    **Dr. Stephen Vatner and UMDNJ**
             **Dkt. No.: ESX-L-8827-11**
             **KTP File No.: 11-139**

Dear Mr. Dee:

      Enclosed please find Plaintiff's Second Amended Complaint along with the Order signed by the Court allowing for same. If you will not agree to accept service of the within Complaint, please advise me immediately, otherwise this shall constitute proper service.

      Thank you for your attention to this correspondence.

             Sincerely,
             **Knapp, Trimboli & Prusinowski, LLC**

             James T. Prusinowski, Esq.

JTP:crj
Data clients:Vatner, Stephen Dr./UMDNJ Litigation/Correspondence/Dee re- 2nd corts 3-20-12.docx