<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DR. STEPHEN VATNER,<br><br>    Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, AND DR. ROBERT JOHNSON,<br><br>    Defendants. | Civil Action No. 12-3339 (JLL) (MF)<br><br><br>**OPINION** |

**LINARES,** District Judge**.**

   This case arises out of allegations that Plaintiff's employer, the University of Medicine and Dentistry of New Jersey, violated, *inter alia*, his procedural due process rights when he was subjected to an unpaid suspension from his tenured position without proper notice and/or an opportunity to be heard. Currently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion for summary judgment is denied in its entirety.


**I.  BACKGROUND**

   The Court first addresses Defendant's motion for summary judgment. The following facts are not in dispute.

1

### A.     The Parties

Plaintiff, Dr. Stephen Vatner, is a Professor of Medicine at Rutgers Biomedical and Health Sciences-New Jersey Medical School and Director of the Cardiovascular Research Institute ("CVRI") at the New Jersey Medical School ("NJMS" or "Medical School").  (Def. 56.1 Stmt., ¶ 1; Pl. Resp. 56.1 Stmt., ¶ 1).  Dr. Vatner named as defendants in this action the "Board of Trustees of the University of Medicine and Dentistry of New Jersey" and Dr. Robert Johnson.  The University of Medicine and Dentistry of New Jersey ("UMDNJ") and Dr. Johnson (together, "Defendants") have appeared in and defended this action. (*Id.*, ¶ 2).  UMDNJ was until June 30, 2013, New Jersey's research and teaching institution for the fields of medicine and other health sciences.  It operated eight schools over five campuses in New Jersey, with campuses in Newark, Stratford, Camden, Piscataway/New Brunswick and Scotch Plains, New Jersey. (*Id.*, ¶ 3).

The New Jersey Medical and Health Sciences Education Restructuring Act (P.L. 2012, c. 45) provides that UMDNJ's schools and facilities, appropriations, grants, other moneys, employees, files, books, papers, records, equipment, other property, and debts (except those of the School of Osteopathic Medicine and its Stratford campus) are transferred to Rutgers, The State University of New Jersey ("Rutgers"), effective July 1, 2013. N.J.S.A. 18A:65A-94, -95, -97, -98 (P.L. 2012, c. 45, §§ 3, 4, 6, 7, 153).   The statute also provides that "whenever, in any . . . judicial . . . proceeding . . . reference is made to the University of Medicine and Dentistry of New Jersey . . . the same shall mean and refer to Rutgers, The State University." N.J.S.A. 18A:65-94(f) (P.L. 2012, c. 45, § 3(f)). The statute further provides that all lawsuits pending against UMDNJ prior to the transfer to Rutgers "shall be continued by Rutgers, The State University" as if the transfers had not taken place. N.J.S.A. 18A:65-95 (P.L. 2012, c. 45, §5). This lawsuit was pending against UMDNJ prior to the transfer.  Because UMDNJ no longer exists (by operation of statute), its

interests in this action have been transferred to Rutgers. (*Id*., ¶ 4).  Dr. Johnson is Dean of NJMS and a Professor of Medicine at the Medical School. (*Id*., ¶ 5).

### B.      Plaintiff's Employment at UMDNJ

On June 20, 2000, plaintiff was offered and accepted the position of Professor with tenure in the Department of Medicine at UMDNJ-NJMS. At that time, Dr. Vatner also became the Director of the Cardiovascular Research Institute ("CVRI") at NJMS and received an administrative supplement to his academic base salary in connection with that appointment. (*Id*., ¶ 6).  In accordance with UMDNJ and NJMS Bylaws, all administrative positions are served at the pleasure of the Dean and do not carry any tenure rights.  (*Id*., ¶ 7).  In accordance with the NJMS Bylaws, "such administrative position is terminable at will." (NJMS Bylaws, Art. II, Title F, § 6.) (*Id*., ¶ 8).

Plaintiff's compensation when he was hired in 2000 was set forth in the June 20, 2000 letter; the total compensation of $390,000 included "tenurable base academic salary" of $150,000, and an "administrative supplement for serving as Director of the CVRC" of $35,000. (*Id*., ¶ 9). Plaintiff's tenure rights were limited to his appointment as Professor and did not apply to his administrative appointment as Director of the CVRI. (*Id*., ¶ 10).  In accordance with the applicable Bylaws, plaintiff was specifically informed in the June 20, 2000 letter that the only portion of his $390,000 salary that was tenurable was the $150,000 he received as his academic base salary. (*Id*., ¶ 11).[1]

_____

[1] Although Plaintiff indicates "Disagree" with paragraph 11 of Defendant's 56.1 Statement of Uncontested Material Facts, Local Civil Rule 56.1 provides, in pertinent part as follows: "The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, **if not agreed, stating each material fact in dispute and citing to the**

Subsequent letters from NJMS to plaintiff that set forth his compensation (after the June 20, 2000 correspondence) do not refer to "tenurable" salary; accordingly, the highest figure for "tenurable academic base salary" referred to in an employment letter from NJMS to plaintiff is $150,000. (*Id.*, ¶ 12).[2]  A letter dated May 30, 2002, reflecting the UMDNJ Board's appointment of plaintiff as Interim Chair of the newly-created Chair of the Department of Cell Biology and Molecular Medicine ("CBMM"), provided continued annual compensation of $390,000, including an "Academic Base Component" of $175,000. (*Id.*, ¶ 13).  A letter dated June 24, 2002 offering plaintiff "the position of Professor (with tenure) and Chair of [CBMM]," subject to confirmation by the UMDNJ Board, provided that plaintiff's annual compensation would be $409,500. (*Id.*, ¶ 14).  A letter dated December 31, 2002, informing plaintiff that the Board had approved his

---

**affidavits and other documents** submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." (emphasis added).  In support of Plaintiff's "disagreement" with paragraph 11, Plaintiff states "At the time, the June 20, 2008 agreement set his tenurable academic salary at $150,000, Dr. Vatner's tenurable base was subsequently increased." But Plaintiff's responsive statement does not cite to evidence in the record in support of same, as required by Local Civil Rule 56.1.  As such, paragraph 11 is hereby deemed admitted for purposes of the instant motions.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[2] Again, although Plaintiff indicates partial disagreement with this paragraph, Plaintiff cites to no evidence in the record in support of same.   As such, paragraph 11 is hereby deemed admitted for purposes of the instant motions.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  For this same reason, and without further discussion, the Court also deems admitted any *other* statements contained in Defendant's 56.1 Statement to which Plaintiff has disputed without proper citation to evidence in the record.  Notwithstanding the foregoing, the Court has made every effort to carefully consider *all* the evidence in the record to determine whether the evidence reflects that any particular assertions of fact are actually in dispute.

appointment as Chair, provided for an annual salary of $409,500, with an "Academic Base Component" of $195,000 and a "Faculty Practice Component" of $214,000, and provided further that "[t]his salary is based on the Administrative salary scale and shall remain on that scale during your term as Director of [CVRI] and Chair of [CBMM] . . . ." (*Id.*, ¶ 15).  As Chair in 2010, plaintiff's annual Academic Base Component was $245,550; his Faculty Practice Component was $214,500, and his total compensation was $460,050. (*Id.*, ¶ 16).

Dean Johnson informed plaintiff by letter dated March 29, 2011, that in accordance with Article II, Title B, Section 2.3.2 of the NJMS Bylaws, Dean Johnson had decided to declare the Chair of CBMM vacant effective on that date. (*Id.*, ¶ 29).  On June 8, 2011, plaintiff was informed that he would not be reappointed Department Chair for CBMM, but that he would remain in his other administrative position as Director of the CVRI.  The letter further advised that, effective March 30, 2011, his salary was adjusted as a result of his no longer serving as Department Chair. (*Id.*, ¶ 30).  The reduction in salary was from $460,050.00 to $404,500; plaintiff continued to receive $190,000 as an "academic base salary" in his capacity as Professor of Medicine and as Director of the CVRI, and $214,500 as a "faculty practice component" of his salary as a full Professor. (*Id.*, ¶ 31).

### C.   Animal Research Protocols

The University is subject to a comprehensive federal statutory and regulatory structure aimed at promoting the humane treatment of laboratory animals. (*Id.*, ¶ 32).  In 2007, Dr. Bruce Scharf discovered that Plaintiff's projects involved research on monkeys at St. Luke's Hospital in Manila, Philippines. This facility was not recognized as a qualified location for animal research under United States regulation. Dr. Scharf determined that the research was not approved and that,

therefore, the University was not in compliance with its regulatory obligations. (*Id.*, ¶ 33). The University disclosed to federal regulators that Plaintiff had failed to comply with crucial protocols and procedures concerning securing University approvals for research on live animals. (*Id.*, ¶ 34). These approvals were integral to the University's procedures for complying with the federal animal welfare regulatory scheme applicable to laboratory animals and research protocols involving them. (*Id.*, ¶ 35). The University later concluded (in the investigation commenced in March 2010 and discussed below) that plaintiff continued engaging in such research without submitting to the required internal UMDNJ review or securing the required UMDNJ or external animal-welfare regulatory approvals. (*Id.*, ¶ 36).

### D.      Manilla Trip

In early 2010, Plaintiff sought—and received—permission to travel to Manila, Philippines on University business. (*Id.*, ¶ 44). At some point thereafter, the University learned of allegations that Plaintiff's planned work in Manila would violate the University animal research protocols, which, if true, posed a substantial threat to the University's ability to conduct animal-based scientific research. As such, the University opened an investigation into such allegations and Dean Johnson rescinded Plaintiff's approval to travel to the Philippines. (*Id.*, ¶¶ 45-48).

Plaintiff then asked Dean Johnson for permission to travel to the Philippines on vacation with his wife and not for purposes of University business. Dean Johnson told plaintiff that he would consult with UMDNJ Compliance personnel and would get back to him, but there is no indication that he ever did. (*Id.*, ¶ 49).

In or around March 2010, Plaintiff traveled to the Philippines with his wife. (*Id.*, ¶ 51). When information reached the Dean's Office suggesting that plaintiff had traveled to the

6

Philippines, the Dean's staff contacted the CBMM administrator, who stated that he had been directed by Plaintiff not to disclose Plaintiff's whereabouts. (*Id.*, ¶ 52). The Dean determined that Plaintiff had disobeyed the Dean's instructions and tried to prevent the Department administrator from disclosing this when asked. Plaintiff's March 2010 suspension was based on these determinations. (*Id.*, ¶ 54).

### E.      Contract Claim

Plaintiff's "academic base" salary was reduced in or around March 30, 2011 from $245,550 to $190,000. (Boldt Cert., Ex. G). Plaintiff's breach of contract claim is premised on this reduction.

### F.      Due Process

In or around March 2010, Plaintiff was suspended as Chair without pay for 10 working days based on his failure to comply with Dean Johnson's directive that he not travel to the Philippines at that time. (*Id.*, ¶ 75).

Plaintiff remains a full professor in academic rank, with tenure. (*Id.*, ¶ 74).

### G.      CEPA:  Alleged Whistleblowing Events

Plaintiff alleges the following whistleblowing activities allegedly protected by the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq. ("CEPA"):

> a. In 2008, Plaintiff "raised his concerns with the procedures for procuring equipment and other necessary items to compliance lawyers and specifically referenced the waste of NIH funding and public funds based upon UMDNJ's procedures." (Complaint ¶ 17; letter dated March 4, 2013, from James T. Prusinowski, Esq., attorney for plaintiff, supplementing plaintiff's Answers to

7

Defendants' Interrogatories, Counsel Cert. Ex. S, ("Plaintiff's Supplemental Responses"), Answer to Interrogatory 13.)

b. "On or about January 8, 2009, Plaintiff disclosed to UMDNJ Compliance Officials that NJMS was collecting duplicate funds for the use of space at their animal research facility." (SAC ¶ 24.)

c. In 2009, Plaintiff "raised concerns regarding perceived conflict of interests on the part of Senior Associate Dean for the Graduate School of Biomedical Sciences. Such conflicts of interest were not corrected or eliminated." (Complaint ¶ 27; Plaintiff's Supplemental Answer to Interrogatory 16.)

d. "On or about September 7, 2011, Plaintiff, after having made several requests directly to UMDNJ, contacted NIH regarding individuals who were being paid with NIH grant money but were not [at that time] performing work with, for or on behalf of NIH grant projects." (Complaint ¶¶ 71, 76, and 97; Plaintiff's Supplemental Response to Interrogatories 20, 23 and 97.)

(*Id.*, ¶ 82).   The Second Amended Complaint also alleges that "on or about December 12, 2008, Plaintiff informed the UMDNJ Ethics Liaison Officer about purchasing irregularities with regard to NIH Funds." (*Id.*, ¶ 83).

Plaintiff alleges that he was subjected to the following retaliatory actions because of his allegedly protected conduct:

(1) Plaintiff was reprimanded allegedly for violating purchasing protocols,

(2) Plaintiff was suspended and reprimanded for allegedly attending to research in the Philippines in violation of a directive issued by Dr. Johnson,

(3) Plaintiff was removed from his position as Chair of his department,

(4) Plaintiff's salary was improperly reduced,

(5) Plaintiff has been prevented from accessing funds he was contractually authorized to utilize for UMDNJ research,

> (6) several investigations allegedly looking into Plaintiff's actions were initiated but never completed, despite the passage of a significant amount of time.

(*Id.*, ¶ 84).

As to the purchasing matter, UMDNJ policy required that purchases only be made from approved vendors. (*Id.*, ¶ 87). The University's reprimand of plaintiff relating to the purchasing matter resulted from CBMM's purchase of an item of used equipment from a Department employee, Franco Rossi—who was not an approved vendor. (*Id.*, ¶¶ 86, 88). Plaintiff did not disclose the purchase or the policy violation to the University; rather, the UMDNJ investigator who was looking into the matter told Plaintiff about the violation in the course of investigating it. (*Id.*, ¶ 89).

The non-compliant purchase was not the University action Plaintiff alleges to be "inconsistent with public policy" in connection with his CEPA claim in this action. Rather, Plaintiff alleges that "by reprimanding Dr. Vatner and precluding the University from conducting business with individuals not on the authorized vendor supplier list, UMDNJ has failed and continues to fail to ensure that the public funds it is entrusted with are used in the most effective and efficient manner. Such failure regarding use of public funds is a violation of public policy." (*Id.*, ¶ 90). Plaintiff also claims that Dean Johnson's decision to reprimand plaintiff was "against [UMDNJ's] internal rules and public policy." (*Id.*, ¶ 91).

According to the September 2008 letter of reprimand, as Chair, plaintiff was held responsible for Department purchasing matters and a violation of UMDNJ Purchasing policy in the Department, based on a UMDNJ Investigations report:

> Specifically, the report refers to a transaction in which the Department of Cell Biology and Molecular Medicine purchased

9

used laboratory equipment from an employee within your department, Franco Rossi. Furthermore, the report states that you approved the concept of purchasing this equipment from Mr. Rossi, but that you do not know the specifics of the purchase or the cost of the equipment.

As Chair of Cell Biology and Molecular Medicine, you are responsible for your department's compliance with all UMDNJ and NJMS Policies, and ensuring that appropriate levels of control are in place within your department to ensure that these policies are adhered to. The breakdown of these controls resulted in this inappropriate purchase of equipment from Mr. Rossi. In addition, according to the Bylaws of the New Jersey Medical School, you "have general administrative responsibility for, as well as participate in, the educational, research, health care and service programs of the department." (NJMS Bylaws, Title B, Section 2.1).

In addition, Dean Johnson directed the plaintiff to fire Mr. Rossi over the purchasing violation. Plaintiff refused, so Dean Johnson fired Mr. Rossi. (*Id.*, ¶ 92).

Plaintiff's alleged whistleblowing claim concerning "collection of duplicate funds" relates to charges by NJMS to CBMM for animal research facilities used by CBMM. (*Id.*, ¶ 93). Generally speaking, when NIH grants are awarded, the institution (in this case UMDNJ) receives an amount of money that is divided into two categories. One is "Facilities and Administration," also referred to as "F&A" or "indirect costs." The other is "direct costs." (*Id.*, ¶ 96). Direct cost funds are provided to the Principal Investigator to provide the budget for laboratory work on the grant, such as salaries and supplies. (*Id.*, ¶ 97). A percentage of each grant is paid to the University as F&A funds for overhead expenses that indirectly support research; the percentage is negotiated between the University and the NIH on a periodic basis. (*Id.*, ¶ 98). UMDNJ grants management personnel have determined that it is proper to pay "animal research facilities" as a direct charge rather than an indirect cost. (*Id.*, ¶ 101). UMDNJ distributes a portion F&A funds received from NIH to its Departments to pay overhead expenses (e.g., animal research space charges). (*Id.*, ¶ 102).

It is Plaintiff's position that because the State of New Jersey funded UMDNJ, it was impermissible "double-billing" for the University to pay a usage fee or rent from an NIH grant. (*Id.*, ¶ 108). Plaintiff's Supplemental Response to Interrogatory 15 also suggests that charging per diem fees for animals and also charging rent for the space where the animals are housed is akin to double-billing. (*Id.*, ¶ 109).

A January 8, 2009 e-mail to UMDNJ Compliance personnel from Geoffrey Seeger, CBMM administrator, stated, "part of [plaintiff's] recruitment package at NJMS involved the facilities he would need to work on his federal grants . . . . In contrast to all other laboratory space which is covered by indirect costs, NJMS charges our department in addition directly for this laboratory space." (*Id.*, ¶ 94). Mr. Seeger's January 8, 2009 e-mail also stated that it appeared that both "direct and indirect costs" were being charged. (*Id.*, ¶ 95). The Compliance personnel contacted by Mr. Seeger consulted with William Gause, NJMS Senior Associate Dean for Research, and NJMS CFO David Roe, who advised Mr. Seeger by e-mail dated January 12, 2009 (and copied to plaintiff) that if CBMM had concerns about paying for animal research space from direct cost funds, then CBMM should use departmental funds from other sources to pay these charges. (*Id.*, ¶ 99). Mr. Seeger responded by e-mail dated January 13, 2009 (Counsel Cert. Ex. V, Ex. D-30) thanking Mr. Roe and Dr. Gause for reviewing the fairness of the procedures and stating that Plaintiff "does not object to paying for research space if all other departments also pay for their research space, but he does object to being singled out." (*Id.*, ¶ 104).

Plaintiff's purported whistleblowing about the Senior Associate Dean for GSBS, Dean Andrew Thomas, is based on the claim that serving as Dean at the same time he was Chair of the NJMS Department of Physiology and Pharmacology, was "unethical," violated a UMDNJ policy

and presented a conflict of interest. (*Id.*, ¶ 114).  Plaintiff claims that the University's conduct with

regard to Dean Thomas was inconsistent with "public policy" is based on the following:

> Dr. Thomas became the Dean of the Graduate School for Biomedical Sciences, while still Chair of the Department of Physiology and Pharmacology. By holding these two positions simultaneously, the Dean was able to allocate additional funds to the department that he chaired without adequate oversight.
>
> By being Dean of the Graduate School for Biomedical Sciences, Dr. Thomas was responsible for allocating funds to all of the departments which he oversaw. Since he was the Chair of the Department of Physiology and Pharmacology, Dr. Thomas has a personal vested interest in allocating additional funds to his department thereby favoring his department over other departments he oversaw as Dean. The potential for allocating funding in this manner shows that there was a conflict of interest that undermined the handling of funds within the University.
>
> The University operates with public funding, and it is Dr. Vatner's understanding that public policy requires that the funds be administered appropriately. Individuals should not be able to allocate funds to themselves as this avoids the appropriate checks and balances required to ensure that funds are not being misused or misappropriated.

(*Id.*, ¶ 116).

With regard to Plaintiff's alleged whistleblowing concerning "individuals" being paid from

NIH grants after they were no longer doing grant work, these "individuals" were NJMS employees

who had been hired by plaintiff to work on grants on which plaintiff was Principal Investigator

("PI"). Their performance was later deemed by plaintiff to be unacceptable or unnecessary on the

grant project.  (*Id.*, ¶ 118).  According to Plaintiff:

> Upon contacting NIH, Dr. Vatner was informed by NIH that the funds provided through the grants were to be used for grant related research. He was further informed that paying individuals who were not performing grant related research was improper. Thus, NIH confirmed his understanding of the proper rules and public policy related to NIH grant funds.

(*Id*., ¶ 122).  According to NIH, it is acceptable for a grantee institution to use grant funds to pay employees while the institution follows its own internal policies and procedures for terminating the employment of a grant-supported employee, and the University acted properly in connection with an audit relating to these particular employees. (*Id*., ¶ 122).

In light of the foregoing, Plaintiff commenced the instant cause of action in November 2011 in the Superior Court of New Jersey, Law Division, Essex County.  Plaintiff's Complaint was removed to this Court in June 2012.  This Court's jurisdiction over Count One (Plaintiff's § 1983 procedural due process claim) is premised on federal question, 28 U.S.C. § 1331.  This Court's jurisdiction over the remaining state law claims is premised on supplemental jurisdiction, 28 U.S.C. 1367(a).  The operative complaint in this matter, the Second Amended Complaint, contains the following four claims:  (1) procedural due process claim pursuant to 42 U.S.C. § 1983, (2) breach of contract, (3) violation of New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., as against UMDNJ, and (4) violation of New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., as against Dr. Robert Johnson.  The parties have filed cross-motions for summary judgment as to all four claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).   If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.    DISCUSSION

As stated above, Plaintiff's Second Amended Complaint contains the following four claims: (1) procedural due process claim pursuant to 42 U.S.C. § 1983, (2) breach of contract, (3) violation of New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., as against UMDNJ, and (4) violation of New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq., as against Dr. Robert Johnson.

The Court begins by noting that although Plaintiff seeks summary judgment as to a claim for breach of the implied covenant of good faith and fair dealing, the Second Amended Complaint contains no such claim.  *See* Docket Entry No. 1, Ex. E.   Because Plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment," the Court declines to entertain Plaintiff's arguments vis-à-vis the implied covenant of good faith and fair dealing.  *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (citation omitted).  Rather, "at the summary judgment stage, the proper procedure for plaintiffs to assert a new claim

is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004).

### A.      § 1983 Procedural Due Process Claim

Count One of Plaintiff's Second Amended Complaint alleges a violation of Plaintiff's § 1983 procedural due process rights.

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.' " *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).   In order to determine what process is due in a particular situation, courts generally consider three factors: first, the private interest at stake; second, the risk of erroneous deprivation of that interest through the procedures used and the probable value of different procedures; and third, the government's interest.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Reich v. Beharry*, 883 F.2d 239, 242 (3d Cir. 1989).

Thus, "the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quotation omitted). Nonetheless, "[t]here are . . . some situations in which a postdeprivation hearing will satisfy due process requirements." *Id*. at 542 n. 7.  "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar,* 520 U.S. 924, 930 (quotation omitted). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Id*. (quotation omitted).

15

To establish a cause of action under § 1983, a plaintiff must show (1) there was a violation of a right secured by the Constitution and laws of the United States, and (2) the alleged violation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).  It is not contested that Defendants were acting under color of state law.  Hence, the remaining § 1983 issue is whether Plaintiff was deprived of a constitutional right.  Plaintiff's principal procedural due process claim is that he was entitled to adequate notice and a meaningful hearing before he was suspended without pay for 10 days.  This claim poses two issues: (1) Whether Plaintiff has a property interest that triggers the protection of procedural due process, and (2) if so, whether the "process due" requires a predeprivation hearing.

The Court begins by noting that to the extent Plaintiff's procedural due process claim is premised on disciplinary actions *other* than his unpaid suspension, such alleged reprimands or the termination of his right to conduct K-9 research—none of which affected his salary or benefits— do not constitute a deprivation of employment (or property interest) for purposes of triggering his procedural due process rights.[3]  *See Edwards v. California University of Pennsylvania*, 156 F.3d 488, 492 (3d Cir.1998) (holding that "temporary removal from class duties . . . does not constitute a deprivation of employment" for purposes of procedural due process).  To the extent Plaintiff's procedural due process claim is premised on the reduction of his tenured salary, Plaintiff cites to no binding legal authority in support of the theory that his property interest in the *entirety* of his tenured salary was constitutionally protected.  As such, the Court concludes that Plaintiff has failed to meet his burden of establishing that his property interest in the *entirety* of his tenured salary was constitutionally protected.  *See, e.g., Williams v. Texas Tech. Univ. Health Sciences Ctr.,* 6 F.3d

---

[3] Plaintiff concedes that a suspension with pay "may not require that due process be provided."

290, 294 (5th Cir. 1993) ("Given the uncertainties underlying the employment relationship between the university and Doctor Williams, we cannot say that the law clearly established that his property interest in the entirety of his salary was constitutionally protected. The 'mutually explicit understanding' between the university and Dr. Williams rested on periodic evaluations and salary revisions. A reasonable administrator could have concluded on these facts that Dr. William's salary could be adjusted without treading on ground clearly protected by the Constitution.").

There is no dispute, however, that "tenured professors at public universities hold a property interest in their tenure, so that procedural due process is necessary when the university seeks to dismiss a tenured professor." *Univ. of Pittsburgh v. United States*, 507 F.3d 165, 176 (3d Cir. 2007). In *Gilbert v. Homar*, the Supreme Court assumed, without deciding, that a government entity's suspension, *without pay*, of a public employee, who has a protected property interest in his continued employment, amounts to a property deprivation sufficient to implicate due process protections. 520 U.S. 924, 929 (1997) (noting "we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination"). Nor do the parties dispute that Plaintiff had tenure rights to his appointment as Professor at UMDNJ, and, on March 26, 2010, Plaintiff received a Letter of Reprimand advising him that he would be suspended for ten work days "without pay," effective March 26, 2010.

In light of the foregoing, and given that Defendants do not expressly dispute that Plaintiff's unpaid suspension from his tenured position as Professor amounts to a property deprivation sufficient to implicate procedural due process protections, the Court finds that Plaintiff has met his burden of demonstrating that his suspension without pay from his tenured employment amounts to a property deprivation sufficient to implicate procedural due process rights. *See, e.g.*, *Solomon*

*v. Philadelphia Housing Auth.,* 143 F. App'x 447, 452 (3d Cir. 2005) ("Appellant had a protected property interest in continued employment not interrupted by suspension or termination absent just cause.").[4]  As such, the Court must determine whether the "process due" requires a predeprivation hearing, as Plaintiff suggests.

Generally speaking, "absent extraordinary circumstances," Plaintiff cannot be suspended without pay from his tenured employment unless there has been a pre-suspension hearing.  *See, e.g., Schmidt v. Creedon,* 639 F.3d 587, 596 (3d Cir. 2011) ("We therefore reaffirm our holding in *Dee* that, absent extraordinary circumstances, policemen cannot be suspended without pay unless there has been a pre-suspension hearing.").   "Post-deprivation process alone may satisfy the requirements of the Due Process Clause if a state must act quickly or if pre-deprivation process would be impractical." *Solomon v. Philadelphia Hous. Auth*., 143 F. App'x 447, 453 (3d Cir. 2005) (citing *Gilbert*, 520 U.S. at 929).  Defendants point to no evidence in the record suggesting that either of these situations existed at the time Plaintiff was suspended, *or* suggesting that Plaintiff received a prompt post-suspension hearing.   As such, the Court must determine whether the particular process afforded to Plaintiff was constitutionally sufficient.  *See, e.g., id.*

Defendants maintain that: (1) Dean Johnson afforded Plaintiff with an opportunity to respond to the claims of insubordination and/or to the imposition of the unpaid ten day suspension when he met with Plaintiff in person on March 26, 2010; and (2) that Plaintiff could have appealed

---

[4] *See generally Loudermill*, 470 U.S. at 545–546 (stating that employers may avoid due process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave); *Edwards*, 156 F.3d at 492 (noting that placement of tenured professor on paid leave did not implicate due process concerns).

Dean Johnson's decision to suspend Plaintiff to the Dean's supervisors at UMDNJ, Executive Vice President of Academic and Clinical Affairs Denise Rodgers or to President William Owen.[5]

Turning now to the interest-balancing framework set forth by the Supreme Court in *Mathews v. Eldrige*, the Court must determine whether the totality of the administrative process

---

[5] The Court notes that there is a factual dispute as to whether Plaintiff had a right to appeal Dean Johnson's March 26, 2010 decision. In support of its position that Plaintiff could have—but did not—appeal Dr. Johnson's March 26, 2010 suspension, Defendants rely again on testimony by Dean Johnson, wherein he states:

> Q: And with a suspension without pay for a faculty member who is not part of the union contract, would there be an appeal process for challenging that decision?
>                         ***
> A: The imposition could be appealed to my supervisor. So when it was UMDNJ, the executive vice president of academic affairs or the president.
> Q: And that would be by way of letter to them?
> A: I don't know. I'm not sure that there's a formal process, but I think most often it would be through a letter.

(Boldt Cert., Ex. MM at 81:18- 82:7). The March 26, 2010 letter makes no reference to Plaintiff's right to appeal his unpaid suspension. (*Id*., Ex. P). There is also evidence in the record, however, indicating that Plaintiff attempted to appeal Dean Johnson's March 26, 2010 suspension and was told by Freda M. Zackin, the Vice President for Academic Affairs, that his appointment as Department Chair is "at-will" and "there is no appeal mechanism in this situation." (Prusinowski Cert., Ex. 34). Even assuming, *arguendo*, that Plaintiff had sufficient *post*-deprivation procedures available, the Third Circuit has specifically held that no case stands for the broad proposition that a pre-deprivation hearing is unnecessary when post-deprivation procedures are available. *See Schmidt v. Creedon,* 639 F.3d 587, 597 (3d Cir. 2011) ("Neither case supports the broader claim advanced by appellees that a pre-deprivation hearing is unnecessary when post-deprivation union grievance and arbitration procedures are available."). As such, regardless of whether Plaintiff could have challenged his unpaid suspension through any type of appeals process does not remove all need for basic pre-deprivation process. *See id.* at 455. This is particularly relevant in this case given that Defendants do not argue that that providing such limited pre-suspension hearings would have imposed any administrative or fiscal burden on the University. As such, and as stated below, in the absence of any "extraordinary circumstances," the Court finds that Defendants were required to provide Plaintiff with a pre-suspension hearing before they suspended him, without pay, from his tenured employment. *See Schmidt,* 639 F.3d at 596 ("We therefore reaffirm our holding in *Dee* that, absent extraordinary circumstances, policemen cannot be suspended without pay unless there has been a pre-suspension hearing.").

Plaintiff received in connection with his suspension satisfied the "fundamental requirement of due process[, which] is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 221 (3d Cir. 2009) (citing *Mathews*, 424 U.S. at 333).

First, the Court finds that the private interest affected here is the continuation of Plaintiff's pay (i.e., the means of sustaining his livelihood). This private interest is, of course, significant. *See, e.g., Solomon*, 143 F. App'x at 454 ("Therefore, the private interest at stake was great, namely the deprivation of the means of Appellant's livelihood.").

The Court finds that the second factor—risk of erroneous deprivation—was similarly great in this case inasmuch as there were conflicting stories as to whether Plaintiff had violated the Dean's directive. For example, Dean Johnson testified that he rescinded the "travel approval" that was originally granted to Plaintiff so that he could travel to the Philippines "for the purpose of University business." (Boldt Cert., Ex. MM at 96:10-97:6). Although it is undisputed that Plaintiff did in fact travel to the Philippines, Plaintiff testified that: (a) he paid for the trip himself, (b) he did "not do any work there," and (c) he spent the time there on vacation with his wife on an island off shore—"Ialo Ialo." (Boldt Cert., Ex. NN at 303:6-305:25). Dean Johnson conceded that he was "not sure" what Plaintiff did when he went to the Philippines. (Boldt Cert., Ex. MM at 97:10-13). *See, e.g., id.* at 454 ("Where an employer is informed that an employee will imminently be arrested, and where that employee denies the accusations leveled against him, there is a substantial risk of an erroneous deprivation if that employee is suspended without any pre-deprivation process."). Evidence in the record also indicates that after Plaintiff's travel approval was rescinded, he then asked Dean Johnson—in an email dated March 5, 2010—for permission to nevertheless travel to the Philippines on vacation, and Dean Johnson responded—in an email dated

20

the same day—by stating: "this request is under evaluation in Compliance." (Boldt Cert., Ex. O). There is no evidence in the record indicating whether or not Compliance ever made a determination as to Plaintiff's request to travel to the Philippines on vacation and/or whether such determination was ever conveyed to Plaintiff.  In light of this evidence, the Court finds that there was certainly a factual dispute as to whether or not Plaintiff had in fact violated Dean Johnson's directive. *See generally Codd v. Velger,* 429 U.S. 624, 627 (1977) ("The purpose of such notice and hearing is to provide the person an opportunity to clear his name. But if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.").

Finally, the Court finds that Defendants' interest in suspending Plaintiff without pay and without a meaningful pre-deprivation hearing was minimal.  This is not a situation where Plaintiff had been arrested or indicted for criminal wrongdoing.  *See, e.g., Solomon*, 143 F. App'x at 454-55 ("While we do not underestimate the importance of quickly terminating an active officer who has been arrested, the fact that Appellant had not yet been arrested and he wasn't 'on the streets' minimizes any remaining government interest in not according any measure of pre-suspension process."); *Gilbert,* 520 U.S. at 932 (finding that "the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers.").  Rather, evidence in the record shows that Plaintiff was suspended based upon his alleged failure to follow Dean Johnson's directive to cancel his trip to the Philippines.

Based on these factors, and absent any "extraordinary circumstances," the Court finds that Plaintiff should have been afforded the minimal pre-deprivation process of notice and an

opportunity to be heard.  *See generally Schmidt,* 639 F.3d at 596.   As the Third Circuit stated in *Solomon*, such process would not have necessarily resolved the dispute definitively, but at least it "would have accomplished the goal of pre-deprivation process, namely an initial check against a potentially mistaken decision." *Solomon,* 143 F. App'x at 454-55.

Turning now to the evidence in the record, in support of its position that Dean Johnson afforded Plaintiff a *pre-deprivation* opportunity to respond to the claims of insubordination and/or the imposition of the suspension, Defendants cite to the following deposition testimony of Dean Johnson:

> Q:     Did you meet with Dr. Vatner upon his return to discuss this with them before you issued the memo?
> A:     I met with him at the time we issued the memo, yes.
> Q:     Was the meeting with the intention to give him the memo or to hear what he had to say about the travel?
> A:     Both.

(Boldt Cert., Ex. MM at 107:19-108:1).

Evidence in the record also demonstrates, however, that: (1) pursuant to the letter of reprimand at issue, dated March 26, 2010, Plaintiff's suspension was effective on the same day—March 26, 2010,[6] (2) Dean Johnson submitted the Faculty Transaction Form authorizing Plaintiff's "suspension w/out pay" on March 25, 2010,[7] and (3) the memorandum from Dean Johnson to

---

[6] (Boldt Cert., Ex. P).

[7] (Prusinowski Cert., Ex.  26).  Although said Faculty Transaction Form indicates that the effective date for the unpaid suspension would be "3/29/10," as previously stated, the March 26, 2010 Letter of Reprimand that was given to Plaintiff stated that the unpaid suspension was effective "today, Friday, March 26, 2010." (*Id.*, Ex. 31).

Freda Zackin, Vice President for Academic Affairs containing the Faculty Transaction Form is dated March 25, 2010 and states:

> This is to advise you that I have suspended Dr. Stephen Vatner for a period of two weeks beginning March 26, 2010 without pay. Attached is the necessary paperwork to remove him from payroll for this period."

(*Id.*, Ex. 30).

Viewing the record in the light most favorable to Plaintiff, the Court finds that a reasonable jury *could* conclude that: (1) the decision to impose an unpaid suspension on Plaintiff had already been made by the point in time in which Dean Johnson handed him the March 26, 2010 letter of reprimand, and (2) Plaintiff's suspension was, in fact, already in effect by the point in time in which he received notice of same.    In other words, the Court finds that a reasonable jury could find that Defendants failed to provide Plaintiff with advance notice of his unpaid suspension and/or with a *meaningful* opportunity to be heard before it went into effect. *See, e.g., Abbott v. Latshaw,* 164 F.3d 141, 147 (3d Cir. 1998) ("Abbott has a strong claim against Diehl for violating his right to procedural due process by failing to give him advance notice and an opportunity to be heard prior to Latshaw's seizure of the van.").  Because there are genuine issues of material fact in dispute as to whether Plaintiff received advance notice before his unpaid suspension went into effect and/or a had a meaningful opportunity to be heard before it went into effect, Defendant's motion for summary judgment as to Plaintiff's procedural due process claim must be denied.   For this same reason, Plaintiff's cross-motion for summary judgment as to this claim is also denied.

### B.      CEPA Claims

Counts Three and Four of the Second Amended Complaint allege violations of CEPA as against UMDNJ and Dr. Robert Wood.  The crux of Plaintiff's CEPA claims is that Plaintiff was retaliated against by Defendants based upon his belief (and corresponding whistleblowing activity) that Defendants were engaging in the mismanagement of public funds, in violation of "New Jersey's public policy." (Entry No. 78 at 16).  As such, Counts Three and Four are premised on the CEPA provision barring retaliatory action against an employee who objects to an employer activity, policy, or practice that the employee reasonably believes to be "incompatible with a clear mandate of public policy concerning the public health." N.J.S.A. 34:19-3(c)(3).

New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. § 34:19–1, et seq., was enacted to protect employees who report illegal or unethical actions in the workplace, and also to encourage such reporting.  *Fleming v. Corr. Healthcare Solutions, Inc.*, 164 N.J. 90, 96 (2000). New Jersey courts apply the familiar *McDonnell–Douglas* burden-shifting framework in evaluating claims under the statute. In order to state a prima facie retaliation case under CEPA, a plaintiff must prove by a preponderance of the evidence that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a whistleblowing activity described in N.J.S.A. § 34:19–3c; (3) an adverse employment action was taken against him or her; *and* (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Massarano v. New Jersey Transit*, 948 A.2d 653, 662 (N.J. Super. App. Div. 2008) (quotation omitted). The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for taking the employment action, after which it is the employee's

burden to demonstrate pretext by a preponderance of the evidence.  *See generally Klein v. Univ. of Med. and Dentistry*, 377 N.J. Super. 28 (App. Div 2005).

As stated above, Plaintiff alleges the following whistleblowing activities allegedly protected by the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq. ("CEPA"):

> a. In 2008, Plaintiff "raised his concerns with the procedures for procuring equipment and other necessary items to compliance lawyers and specifically referenced the waste of NIH funding and public funds based upon UMDNJ's procedures." (Complaint ¶ 17; letter dated March 4, 2013, from James T. Prusinowski, Esq., attorney for plaintiff, supplementing plaintiff's Answers to Defendants' Interrogatories, Counsel Cert. Ex. S, ("Plaintiff's Supplemental Responses"), Answer to Interrogatory 13.)

> b. "On or about January 8, 2009, Plaintiff disclosed to UMDNJ Compliance Officials that NJMS was collecting duplicate funds for the use of space at their animal research facility." (SAC ¶ 24.)

> c. In 2009, plaintiff "raised concerns regarding perceived conflict of interests on the part of Senior Associate Dean for the Graduate School of Biomedical Sciences. Such conflicts of interest were not corrected or eliminated." (Complaint ¶ 27; Plaintiff's Supplemental Answer to Interrogatory 16.)

> d. "On or about September 7, 2011, plaintiff, after having made several requests directly to UMDNJ, contacted NIH regarding individuals who were being paid with NIH grant money but were not [at that time] performing work with, for or on behalf of NIH grant projects." (Complaint ¶¶ 71, 76, and 97; Plaintiff's Supplemental Response to Interrogatories 20, 23 and 97.)

(*Id.*, ¶ 82).  The Second Amended Complaint also alleges that "on or about December 12, 2008, Plaintiff informed the UMDNJ Ethics Liaison Officer about purchasing irregularities with regard to NIH Funds." (*Id.*, ¶ 83).

Plaintiff alleges that he was subjected to the following retaliatory actions because of his allegedly protected conduct:

> (1) Plaintiff was reprimanded allegedly for violating purchasing protocols,
>
> (2) Plaintiff was suspended and reprimanded for allegedly for attending to research in the Philippines in violation of a directive issued by Dr. Johnson,
>
> (3) Plaintiff was removed from his position as Chair of his department,
>
> (4) Plaintiff's salary was improperly reduced,
>
> (5) Plaintiff has been prevented from accessing funds he is contractually authorized to utilize for UMDNJ research,
>
> (6) several investigations allegedly looking into Plaintiff's actions have been initiated but not completed despite a significant amount of time having passed since the investigations were initiated, as well as other retaliatory actions having occurred.

(*Id.*, ¶ 84).

Defendants maintain that Plaintiff cannot make out a prima facie case for CEPA retaliation because he cannot establish, among other things, that his various "concerns" were lawfully protected whistleblowing activities, and also because he also cannot establish causation.   In response, Plaintiff contends that the "concerns" he raised, listed above, constitute whistleblowing activities, and that raising said concerns caused his adverse employment actions.   Based on the reasons that follow, this Court finds that Plaintiff's argument as to causation is deficient at summary judgment.

As to the element of causation, New Jersey courts have held that "plaintiff can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation." *Zaffuto v. Wal–Mart Stores, Inc.,* 130 F. App'x 566, 569 (3d Cir. 2005); *Bocobo v. Radiology Consul. of S. Jersey, P.A.*, No. 02–1697, 2005 WL 3158053, at *3–4 (D.N.J.

26

Nov. 21, 2005).  A CEPA plaintiff can also "prove a causal connection through 'inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action . . . .' " *Dominguez v Costco Wholesale Corp.*, 356 F. App'x 611,  614 (3d Cir. 2009) (citing *Maimone v. City of Atl. City*, 188 N.J. 221 (2006)).  This is not a burden that can be met by speculation: a plaintiff must demonstrate a factual nexus between the protected activity and the retaliatory employment action. *Wheeler v. Township of Edison,* No. 06–5207, 2008 WL 1767017, at *9 (D.N.J. Apr. 15, 2008); *Hancock v. Borough of Oaklyn*, 790 A.2d 186, 194 (N.J. Super. Ct. App. Div. 2002).

Although he points to **no** particular record evidence in support of same, Plaintiff nevertheless posits that "the University's actions are directly connected to the whistleblowing activities and should be presented to a jury." (Pl. Opp'n Br. at 33).  Similarly, Plaintiff states—in a conclusory fashion—that he "has put forth enough evidence to show that a causal connection does exist." (Pl. Sur-reply at 17).  But Plaintiff makes no attempt to articulate for the Court *how* any particular piece of evidence in the record serves as either direct or circumstantial evidence of retaliation as to any of Plaintiff's alleged whistleblowing activities.  Nor does Plaintiff point to any particular piece of evidence in the record—nor has the Court been able to find any—linking *any* of Plaintiff's alleged whistleblowing activities to *any* of the alleged adverse employment actions. For example, Plaintiff points to no evidence that any particular decision-maker (e.g., Dean Johnson, UMDNJ President William Owen, or New Jersey Medical School CEO David Roe) knew about any particular "concern" raised by Plaintiff (e.g., "concerns" about the procedures for procuring equipment, the duplicate funds collected for the use of space at their animal research facility, or the perceived conflict of interests on the part of Senior Associate Dean for the Graduate School of Biomedical Sciences) when they made the decision to engage in conduct that Plaintiff

27

has characterized as adverse employment actions (e.g., Dean Johnson's March 2010 imposition of a 10-day unpaid suspension).

To the extent Plaintiff has attempted to rely on circumstantial evidence in support of the element of causation, Plaintiff makes this argument without citation to evidence in the record. In other words, Plaintiff has failed to meet his burden of coming forward with evidence placing Dean Johnson's knowledge of any one of Plaintiff's "concerns" in temporal proximity with, for example, his imposition of an unpaid 10 day suspension on Plaintiff in March 2010.

"The burden of proof to make a prima facie case rests with the plaintiff." *Dominguez*, 356 F. App'x at 614. As part of his prima facie case, Plaintiff bears the burden of demonstrating, *inter alia*, that a causal connection exists between each whistleblowing activity and each adverse employment action. It is not the Court's responsibility to sift through the voluminous record in this matter in order to find evidence that may or may not substantiate Plaintiff's theory of causation.[8] Nor is it the Court's responsibility to create a timeline of all the events that underlie Plaintiff's CEPA claim and then connect the dots in an attempt to ascertain whether or not any circumstantial evidence of timing may be suggestive of causation. This would be particularly

---

[8] The Court notes that Plaintiff has not clearly articulated any particular theory of causation. For example, Plaintiff does not suggest that the element of causation is met in this case based on the temporal proximity between any particular protected activity and any particular adverse employment action, nor does Plaintiff attempt to show causation through a "pattern of antagonism." *See, e.g., Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir. 1997) ("[W]here there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference."). To the contrary, Plaintiff has taken the position that all questions surrounding causation should be submitted to the jury. This does not relieve Plaintiff from his burden of proof in opposing a properly supported motion for summary judgment. *See Celotex,* 477 U.S. at 323 (stating that a moving party is entitled to summary judgment when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

difficult given that Plaintiff has failed to clearly articulate for the Court: (1) which particular decision maker was responsible for which particular alleged adverse employment action, (2) which particular decision maker(s) had knowledge of his alleged whistleblowing activities, and (3) the timing of each of the alleged whistleblowing activities, as well as the timing of each of the alleged adverse employment actions.

Plaintiff's conclusory statement that the University's actions "are directly connected to the whistleblowing activities," without more, is insufficient to defeat a properly supported motion for summary judgment. Nor is it sufficient to summarily state that "whether a causal connection exists is a jury question." To the contrary, the Supreme Court of the United States has made clear that a moving party is entitled to summary judgment when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. Certainly, Plaintiff's speculative arguments about causation do not suffice to demonstrate the causation he must satisfy in order to set forth a prima facie case of retaliation under CEPA. *Bocobo*, No. 02–1697, 2005 WL 3158053, at *3–4. In the absence of any record evidence supporting causation, this Court finds that there is no material fact at issue with regard to causation, and that Defendant's motion for summary judgment must be granted as to Plaintiff's CEPA claims. *See, e.g., Dominguez*, 356 F. App'x at 614 (affirming district court's grant of summary judgment in favor of defendant as to plaintiff's CEPA claim based upon plaintiff's lack of evidence of causation). Plaintiff's cross-motion for summary judgment as to this claim is therefore denied as moot.

### C.       Breach of Contract Claim

In his response to interrogatories, Plaintiff stated that Defendants breached their contractual obligation to Plaintiff by reducing Plaintiff's salary and by limiting Plaintiff's access to research funds. *See* Pl.'s Response to Interrogatory No. 26.   Plaintiff has since abandoned the aspect of his breach of contract claim premised on his limited access to research funds.   To the contrary, Plaintiff's brief in opposition to Defendants' motion for summary judgment only opposes dismissal of its breach of contract claim to the extent that it is premised on the reduction of his salary.   The Court will construe Plaintiff's breach of contract claim as such.

Plaintiff maintains that Defendants breached their contractual obligations to Plaintiff when they reduced his "tenured academic base salary," which was—according to Plaintiff—guaranteed by contract and by the University Bylaws.   Defendants move for summary judgment on two grounds: (1) Plaintiff's breach of contract claim is barred by CEPA's waiver provision, and (2) in any event, Plaintiff has failed to meet his burden in demonstrating that Defendants breached any contractual obligations owed to Plaintiff.

CEPA, N.J.S.A. 34:19–1 et seq., prohibits employers from taking retaliatory actions against employees "who 'blow the whistle' on organizations engaged in illegal or harmful activity." *Young v. Schering Corp.,* 141 N.J. 16, 23 (1995).   CEPA contains a waiver provision, which provides that:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19–8.  The New Jersey Supreme Court has held that the CEPA waiver provision applies to claims for retaliatory conduct which is actionable under CEPA but not to those causes of action that are "substantially independent" of the CEPA claim. *Young*, 141 N.J. at 29.

Defendants claim that Plaintiff's breach of contract claim is barred under the CEPA waiver provision because Defendants' alleged breach of contract—i.e., their reduction in Plaintiff's salary—also forms the basis of Plaintiff's CEPA claim.   In particular, Defendants point to Plaintiff's Answer to Interrogatory No. 22 wherein he was asked to identify each employment action that "you allege occurred in retaliation" for CEPA-protected activities.  Plaintiff's response included the following "retaliatory actions": "Plaintiff's salary was improperly reduced."  *See* Pl.'s Answer to Interrogatory No. 22.  While there does appear to be some overlap between the two claims, the Court does not find that Plaintiff's breach of contract claim is barred by CEPA's waiver provision inasmuch as it does not require a finding of retaliation.  *See, e.g., Young*, 141 N.J. at 29. ("[T]he waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA.").

Turning now to the merits of Plaintiff's breach of contract claim, "to establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007).  Plaintiff's breach of contract claim is premised on Defendants' breach of, *inter alia*, the University's bylaws which provide, in pertinent part, that "an appointment with tenure carries with it the obligation on the part of the University to continue to provide, until retirement or dismissal for cause, salary for appointed individual consistent with [his]/her rank and years of service." (Prusinowski Cert. ¶16, Ex. 15; Art. III, Title F, § 4 of NJMS Bylaws).  The Bylaws also provide, however, that a tenured

faculty member serving in an administrative position at NJMS has no tenure right to his or her administrative position. Under UMDNJ and NJMS Bylaws, all administrative positions are served at the pleasure of the Dean.  "Only the full academic ranks of Associate Professor or Professor may carry tenure except for those Assistant Professors granted tenure on or prior to adoption of these Bylaws, as amended in 2003." (Counsel Cert. Ex. B UMDNJ Bylaws, Art. II, Title B, § 3; Counsel Cert. Ex. C, NJMS Bylaws, § 3).

Plaintiff's breach of contract claim is premised on the theory that Defendants' reduction of his "academic base" salary from $245,550 to $190,000 in or around March 30, 2011 constituted a breach of: (a) his offer of employment letter dated June 20, 2000, wherein he was offered "tenured" employment with the University, and (b) the University Bylaws, which required in pertinent part that the University continue to provide tenured employees with a salary consistent with their rank and years of service until retirement or dismissal for cause.  Defendants seek summary judgment on the basis that Plaintiff's salary was reduced when he ceased serving as Department Chair, which was an at-will position in which he had no contractual right to continued compensation of any particular amount.

As previously stated, on June 20, 2000, plaintiff was offered and accepted the position of Professor with tenure in the Department of Medicine at UMDNJ-NJMS.  At that time, Dr. Vatner also became the Director of the Cardiovascular Research Institute ("CVRI") at NJMS and received an administrative supplement to his academic base salary in connection with that appointment. Plaintiff's compensation when he was hired in 2000 was set forth in the June 20, 2000 letter; the total compensation of $390,000 included "tenurable base academic salary from the Medical School" of $150,000, and an "administrative supplement for serving as Director of the CVRC" of $35,000.  (Prusinowski Cert., Ex. 1).

32

Subsequent letters from NJMS to plaintiff that set forth his compensation after the June 20, 2000 correspondence do not refer to "tenurable" salary; accordingly, the highest figure for "tenurable academic base salary" referred to in an employment letter from NJMS to plaintiff is $150,000.   For example, a Faculty Form dated December 11, 2001 lists Plaintiff's current and proposed "academic base" as $175,000, as his total UMDNJ salary (current and proposed) as $390,000.  (*Id.*, Ex.4).  A letter dated May 30, 2002, reflecting the UMDNJ Board's appointment of plaintiff as Interim Chair of the newly-created Chair of the Department of Cell Biology and Molecular Medicine ("CBMM"), provided continued annual compensation of $390,000, including an "Academic Base Component" of $175,000. (Prusinowski Cert., Ex. 2). A letter dated June 24, 2002 offering plaintiff "the position of Professor (with tenure) and Chair of [CBMM]," subject to confirmation by the UMDNJ Board, provided that plaintiff's "annual salary" "will continue to be" $409,500. (*Id.*, Ex. 5).  A Faculty Transaction Form dated August 21, 2002 lists Plaintiff's current "academic base" as $185,000 and his proposed "academic base" as $195,000.  (*Id.*, Ex. 6).  A letter dated December 31, 2002, informing plaintiff that the Board had approved his appointment as Chair, provided for an annual salary of $409,500, with an "Academic Base Component" of $195,000 and a "Faculty Practice Component" of $214,000, and provided further that "[t]his salary is based on the Administrative salary scale and shall remain on that scale during your term as Director of [CVRI] and Chair of [CBMM] . . . ." (*Id.*, Ex. 7).  A Faculty Transaction Form dated May 21, 2010 lists Plaintiff's total UMDNJ salary as 460,050 and his "academic base" as $245,550.  (Boldt Cert., Ex. G).   Finally, by way of letter dated June 8, 2011, Dean Johnson confirmed that effective March 30, 2011, Plaintiff was no longer serving as Chair of Department of Cell Biology and Molecular Medicine, and, as such, his new "academic base salary component

as a full Professor and Director of Cardiovascular Research Institute will be $190,000; your Faculty Practice Salary Component will remain at $214,500." (Prusinowski Cert., Ex. 12).

The Court begins by noting that there is no dispute that the *only* document which referred to Plaintiff's "tenurable base academic salary" was his original offer of employment, dated June 20, 2000.  From these facts, a reasonable jury *could* determine that Plaintiff's "tenurable base academic salary" was—and remained throughout his employment--$150,000.  (Prusinowski Cert., Ex. 1).

However, it is at least equally plausible from these facts that Plaintiff's "tenurable base academic salary" was deemed equivalent to Plaintiff's "academic base salary," as the term was used repeatedly (but never defined) in subsequent communications between the parties and in numerous Faculty Transaction Forms.   This is particularly plausible given that the Faculty Transaction Forms make no reference to Plaintiff's "tenurable base academic salary" and clearly differentiated other components of Plaintiff's salary, such as "faculty practice."   Finally, and perhaps most importantly, based on the evidence in the record, a reasonable jury could also conclude that Plaintiff's "academic base salary" was reduced, in or around March 30, 2011 from $245,650 to $190,000.  *See* Boldt Cert., Ex. G; Prusinowski Cert., Ex. 12.

While Defendants' points are well taken—namely, that Plaintiff's salary was reduced when he ceased serving as Department Chair, which was an administrative at-will position in which he had no contractual right to continued compensation in any particular amount, the Court finds that the evidence in the record—documents drafted by the Defendants—are ambiguous as to which portion of Plaintiff's overall salary (or even in particular, his "academic base" salary) comprised his "tenurable" salary or otherwise carried tenure protection.  *See generally In re Miller's Estate*, 90 N.J. 210, 221 (1982) ("Where an ambiguity appears in a written agreement, the writing is to be

strictly construed against the draftsman."). Both sides raise a number of reasonable interpretations of the evidence in the record that must be assessed and weighed by a trier of fact. Viewing the evidence in the light most favorable to the non-moving party, the Court concludes that there are material issues of fact in dispute as to what portion of Plaintiff's salary comprised his "tenurable base academic salary" and, as such, whether Defendants breached their contractual obligations pursuant to Plaintiff's June 20, 2000 offer letter (offering him a position as professor with "tenure") and the University Bylaws (requiring the University to continue to provide employees with "tenured appointment" a salary consistent with his/her appointment and years of service until retirement or dismissal for cause) when they reduced Plaintiff's "academic base salary" from $245,550 to $190,000 in or around March 30, 2011. Defendants' motion for summary judgment as to Plaintiff's breach of contract claim is therefore denied. Having concluded that there are genuine issues of material fact in dispute, Plaintiff's cross-motion for summary judgment as to this claim is also denied.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is granted as to Plaintiff's CEPA claims, and is denied as to Plaintiff's procedural due process and breach of contract claims. Plaintiff's cross-motion for summary judgment is denied in its entirety.

An appropriate Order accompanies this Opinion.

DATED:  February 3, 2015

s/ Jose L. Linares
JOSE L. LINARES
U.S. DISTRICT JUDGE

35